THE STATE v. FLOYD TAYLOR, Appellant.—148 S. W. (2d) 802.

Division Two, March 12, 1941.

608

*Roy McKittrick*, Attorney General, and *Olliver W. Nolen*, Assistant Attorney General, for respondent.

WESTHUES, C.—Appellant, Floyd (Buoy) Taylor, and his brother Ralph were charged by an information filed in the Circuit Court of Ozark County with the murder of Palmer Gilliland. Appellant was found guilty of murder in the first degree and sentenced to imprisonment in the penitentiary for the term of his natural life. From this sentence he appealed. At the close of all the evidence the trial court directed a verdict of acquittal as to the defendant Ralph Taylor. This was the third trial of the case. In the two previous trials the jurors were unable to agree upon a verdict.

Appellant has not filed a brief in this court. By his motion for new trial appellant preserved a number of questions for our review. A motion was filed by appellant to disqualify the sheriff and his deputies in selecting the venire of jurors. The trial court granted the motion as to the sheriff but overruled it as to the deputies and designated one of the deputies to select the venire. This action of the trial court was assigned as error. Appellant argues that the deputies were under the dominion and influence of the sheriff. From the record we are unable to ascertain any fact which disqualified the sheriff. True, the evidence disclosed that he took an active interest in the investigation of the case and was a material witness for the State. In view of this the trial court, out of an abundance of caution, sustained appellant's motion. That the sheriff took an active part in investigating the case did not disqualify him, as that was his sworn duty. The ruling of the trial court was not prejudicial to the rights of appellant. [See State v. McDonald, 342 Mo. 998, 119 S. W. (2d) 286, l. c. 288 (2, 3).]

When the jury was being selected the trial court granted a number of challenges for cause and refused others. The refusal to sustain a number of challenges was assigned as error. There was naturally much notoriety throughout the county with reference to the disappearance of Gilliland and the finding of his body. It would have been difficult indeed to have selected a jury of men who had not heard something about the occurrence. The record disclosed that the trial court in this case permitted full inquiry to ascertain whether any of the prospective jurors were prejudiced in any way against appellant. The jurors named in the motion were examined,

and while their evidence disclosed that they had heard the case discussed, it did not disclose that they had expressed any opinion as to the guilt of appellant. As shown by their evidence they were qualified jurors. The point is ruled against appellant. [State v. McCracken, 341 Mo. 697, 108 S. W. (2d) 372, l. c. 373 (1) and cases there cited.]

■ Appellant contended the evidence was insufficient to sustain the verdict. Since the evidence was all circumstantial we will state the facts proven by the State in detail. Deceased, Palmer Gilliland, was unmarried. He at times lived alone and at other times had a family living in his home with him. He owned much livestock and about fifteen hundred acres of land in the northwest portion of Ozark County. The defendant, Ralph Taylor, lived on a farm owned by his father. On May 5, 1937, appellant, Floyd Taylor, went to the home of Gilliland on the pretext of purchasing some cattle. He spent the day with Gilliland driving about and looking at the livestock. That night Gilliland stayed at the home of appellant and the next morning they were seen together at appellant's home. A witness testified that he saw Gilliland sitting in appellant's car tieing his shoestrings; that he, the witness, was looking for his cows and rode on the running-board of appellant's car, which appellant was driving; that he went with them for a short distance to a point where he found his cows; that this was a short distance from the home of Ralph Taylor. This witness also testified that when he approached the car Gilliland said: "Come and go with me. Buoy is going to take me home. He will be back in a little bit." This was early on the morning of May 6. A short time later two of the State's witnesses passed the home of Ralph Taylor. They testified they saw appellant and Ralph in a car coming through the pasture near the house; that they stopped and one of them got an ax and returned to the car and thereafter they drove back toward the pasture and went in the general direction of where later the body of Gilliland was found. One of these witnesses testified that he later, at about 9:00 A. M., saw appellant and Ralph driving through Almartha toward Gainsville. About 10:00 A. M. appellant and Ralph were seen in a restaurant and drinking establishment, owned by one Shaw, in Gainsville. Two witnesses testified that while in the restaurant they heard appellant state that he had purchased a team of horses and some fine cattle from Palmer Gilliland; that Gilliland was leaving the country; that he had taken Gilliland to highway number five and that Gilliland had said he was going to Arizona and then to California, that he was selling out. These witnesses testified that appellant concluded his remarks with reference to Gilliland in substance as follows: "Just between us, I believe Gilliland is through with this country. I don't believe he will ever be back here." Gilliland was not seen alive by anyone after the early morning of May 6, when he was with appellant. To understand the evidence next in sequence it is necessary to state when

and where the body of Gilliland was found. On June 10, 1937, a posse of about fifty men was formed for the purpose of searching for Gilliland. Members of this posse found the body on the farm occupied by Ralph Taylor, about one-fourth mile from the house in a depression surrounded by woods and brush. A pile of brush about four feet in height was found on the body, and on top of this brush pile was the carcass of a dog. Note here that Gilliland was last seen with Floyd Taylor near the Ralph Taylor place on the morning of May 6. On the following Tuesday witness Dewey Cook was tending to his corn in a field near the place where the body was found. Floyd Taylor came to him and said he was looking after some cattle he had bought. In the course of that conversation, according to the evidence of Cook, Floyd suggested that a dog owned by Cook, which was tied to a wagon in the field, should be killed because it was subject to "fits" and might be "mad." Cook agreed, and thereupon Floyd left saying he would get a gun and kill the dog. He returned in a short time, killed the dog and drug it to a fence at a point which was about one hundred and fifty yards from where, on June 10, the body of Gilliland was found. This was the dog found on the brush pile. Cook testified that Floyd climbed over the fence after he had pitched the dog over and was gone about fifteen minutes; that he could not see him beyond the fence because of the woods and brush. Appellant, while testifying as a witness, admitted killing the dog and throwing it over the fence, but claimed that he left it there and also that he killed the dog at Cook's suggestion. The following day appellant again came to Cook in the corn field. At this time he was riding a horse and had an ax. Cook testified that appellant said he was going to cut some brush in the bottom; that appellant left, but returned in a couple of hours and stated it was too hot to cut brush "and his hands was bloody; a little bit of scratches on his hands." The State also introduced evidence that the body was first covered with small brush and then larger brush piled on; that the smaller brush next to the body had the appearance of having been cut before the larger brush. The brush had all been cut after the leaves had formed that spring. A day or so after Gilliland disappeared appellant took charge of twenty-three head of cattle and two horses belonging to Gilliland and placed the cattle on the farm of Ralph Taylor. Appellant had made statements to the effect that he had purchased the stock and as part of the purchase price paid Gilliland cash in the sum of $385. His evidence at the trial was substantially the same. Witness Cook also testified that the next day after the dog was killed a "No Hunting" sign was placed at a gate on the Ralph Taylor farm. Other witnesses testified that they saw a number of such signs that had been put up about that time in the vicinity where the body was found.

Appellant testified at the trial and admitted being with Gilliland

on May 5 and on the morning of May 6. He emphatically denied that he had anything to do with the murder. He admitted that he stopped at his brother Ralph's place and went over to a pasture with Gilliland to look at a red cow which he wanted to trade or sell to Gilliland. He stated that while there they heard a dog bark in the woods and on investigating found that the dog had a squirrel treed; that they stayed about fifteen minutes and then he took Gilliland to highway number five and saw nothing more of him. He also testified that he paid Gilliland cash in the sum of $385 as part of the purchase price of the cattle. He testified that he borrowed this money from his father. The father corroborated appellant in this, but their evidence upon this subject was very indefinite and in many respects evasive. It was contradicted by other evidence and also contradicted by alleged statements made by the father and appellant. No money was found on the body of Gilliland or at his home in a safe which he kept, and where, according to appellant's evidence, he may have placed the money. Appellant testified that after Gilliland had taken the money he went in the room where the safe was kept and closed the door. The State also introduced evidence of statements alleged to have been made by appellant. The sheriff testified that when he questioned appellant the day before the body was found he asked appellant where he would look for the body, and appellant replied: "Well if I was to go and look for Palmer Gilliland I would look on his place first." He further testified that appellant then asked him, the sheriff: "Can they convict a fellow until the body is found?" To which he replied: "Well I wouldn't think so." And then appellant said: "Well, they like a lot of having anybody convicted." On cross-examination the sheriff was asked what else appellant said and he testified as follows: "He said, 'Poor old Palmer, he is dead. He is killed, but he would be worth a lot more to me alive than he would be dead.'" After the body was found the officers went to the jail and showed appellant the paper giving the account of the finding, whereupon he is alleged to have said in substance: "I am a convicted man." Ralph Taylor is alleged to have stated to the sheriff before the body was found: "If the body is found, I wouldn't be surprised if it ain't found on our place to try to throw suspicion on us boys." The sheriff and another witness also testified that after appellant and Ralph Taylor had read the paper they were questioned, and when they were about to be separated one of the defendants said in substance: "I will take this on myself," and the other replied, "No, you won't, I will take my part of it." There are many other minor details of evidence in the record pointing to the guilt of appellant which we deem unnecessary to relate. We deem the above evidence, though circumstantial, sufficient to sustain the verdict. It meets the requirements of the law that circumstantial evidence to authorize a conviction must exclude any reasonable theory of the

defendant's innocence, and that the facts proven must form a complete chain, must be consistent with each other and must point to the guilt of the defendant. [23 C. J. S., page 149, sec. 907.]

■ Appellant assigned error for failure to submit an instruction on murder in the second degree. The evidence did not justify the giving of such an instruction. In addition to the facts above related the evidence showed that the body of Gilliland was found lying in a depression or hole, face downward, with a sack spread over the head and shoulders. The coroner testified that the head was practically decomposed; that he picked up twenty-five or more small pieces of bone where the head had been. Another witness testified that a few days after the body had been removed and the offensive odor had subsided so that he could make a close examination, he took a pitchfork and lifted a mass or crust of broken bone and hair matted together from the spot where the head had been lying. This witness and the coroner testified that where the head had been there was a depression of several inches in the earth. That is mute evidence showing a brutal and horrible murder. Evidently the head of the deceased had been beaten into the ground and the skull crushed into fragments. Further comment is unnecessary. An instruction on second degree murder was not justified because the facts proven showed murder in the first degree and nothing else. Murder in the first degree may be shown by circumstances. [See State v. Lewis, 273 Mo. 518, 201 S. W. 80, l. c. 84 (3-6) ; State v. Page, 130 S. W. (2d) 520, l. c. 523 (1, 2).]

■ The trial court gave an instruction informing the jury in substance, that if from all the circumstances and the evidence they found beyond a reasonable doubt that Floyd Taylor killed Gilliland for the purpose of robbing him of his property, then such killing was murder in the first degree. Appellant urges that the State's evidence did not justify a finding that appellant intended to rob Gilliland of his property. To this we cannot agree. Appellant admitted getting over $400 worth of Gilliland's property immediately after Gilliland disappeared. The evidence justified the inference that appellant did not pay for the property and that he killed Gilliland for the purpose of getting the cattle and horses. Instructions of this nature have frequently been approved. [See State v. McGinnis, 158 Mo. 105, l. c. 121, 59 S. W. 83, l. c. 87; State v. White, 330 Mo. 737, 51 S. W. (2d) 109, l. c. 112.]

■ When appellant was on the witness stand being questioned about Gilliland staying with him on the night of May 5, the following occurred:

"Q. Now, back to the time Palmer stayed all night with you, what time did you go to bed that night? A. I don't remember. I expect we sat around and talked till probably late bed-time.

"Q. Was there anything said in that conversation about Palmer

going anywhere?'' The State's objection was sustained and that ruling assigned as error. Appellant at the time informed the court that the evidence was admissible to explain appellant's statements alleged to have been made to witness Ebrite and others on May 6, that Gilliland had gone to Arizona, and that the evidence was also admissible to show Gilliland's intent or state of mind. The intent or state of mind of Gilliland was immaterial, as it is evident he did not go to Arizona. Whether or not he intended to go was not material to appellant's defense. Appellant did not admit making the statements concerning Gilliland on May 6, at Shaw's place, as testified to by witness Ebrite and others. Had he admitted making such statements we would be confronted with a different situation. Since appellant did not admit making such statements there was nothing for him to explain. It was for the jury to say whether appellant or the State's witnesses were telling the truth. The point is ruled against appellant.

The evidence disclosed that one Harold Bushong was an employee of Gilliland and that immediately after the disappearance of Gilliland Bushong took charge of and moved to the home of Gilliland. Appellant offered evidence by witnesses that Bushong had stated he received two letters from Gilliland, and also that Bushong had sold hogs belonging to Gilliland. The State objected to this evidence because it was hearsay and Bushong was present in court and could be called as a witness. Bushong had testified for the State at a previous trial. His evidence given at a previous trial was placed in the record in this case, but was not read to the jury. The evidence offered by appellant concerning these matters was for the most part hearsay as to statements alleged to have been made by Bushong. Such hearsay evidence was inadmissible and the ruling of the trial court was correct. The evidence in the record, as given by Bushong at a previous trial, was in our opinion very damaging to appellant. That probably accounts for the fact that appellant did not call him as a witness, but that did not justify the admission of hearsay evidence. The record also discloses that Bushong was an ex-convict, and perhaps that is the reason the State did not desire to vouch for his evidence.

Appellant also assigned error to the admission of evidence with reference to the appearance of ''No Hunting'' signs in the vicinity where the body was found, because the evidence failed to show the defendant had anything to do with the signs. There is no merit in this point. It was a circumstance to be considered by the jury. Practically every day, after Gilliland had disappeared, appellant was in the vicinity of these signs. He had his cattle, which he claimed he bought from Gilliland, on Ralph Taylor's place. Appellant testified that he repaired the fences in this vicinity, and we may infer that if the signs were there he saw them. Appellant offered

evidence by his father and another witness that the signs were there prior to May 8. The father of appellant testified that he had placed such signs there on a prior date.

A number of other assignments made in the motion for new trial have been examined with reference to the record in the case and found to be without merit. The information and verdict and other matters of record disclose no error.

The judgment is affirmed. *Cooley* and *Bohling*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.