STATE v. EDGAR HOLLAND, Appellant.—No. 39581.—189 S. W. (2d) 989.

Division Two, November 5, 1945.

*Fred F. Wesner* for appellant; *John L. Sullivan* of counsel.

528

*J. E. Taylor,* Attorney General, and *W. Brady Duncan,* Assistant Attorney General, for respondent.

530

WESTHUES, C.—Appellant, Edgar Holland, was convicted in the circuit court of Pettis county, Missouri, of murder in the first degree and sentenced to life imprisonment. An appeal was duly perfected.

The victim of the alleged murder was the wife of appellant. At the trial of the case, as on this appeal, the principal contention of appellant was, and is, that the evidence was insufficient to sustain a conviction. The evidence introduced was all circumstantial. Because of the points briefed a full statement of the evidence will be required. It disclosed the following facts: On Sunday, April 16, 1944, the body of a woman was found in the Lake of the Ozarks a short distance north and east of the Glaize bridge spanning the lake on highway 54 in Camden county, Missouri. The exact point where the body was found was at the foot of lake road 15, being the old roadway of highway 54 before Bagnell Dam was built causing the lake to form and resulting in the building of the Glaize bridge. The head and right leg of the body had been severed and were never found. The officers, that is the coroner and sheriff of Camden county, took the body to a funeral establishment in Camdenton. This body was later identified as that of Mrs. Fairfax, the mother-in-law of appellant.

On Monday morning, April 17, another headless body of a woman was found a short distance down stream from the point where the first body was found. It was also taken to the funeral establishment at Camdenton. This body was later identified as that of Mrs. Holland, appellant's wife. Both bodies were practically nude when found. The one found on Monday was clad with a pair of step-ins and hose on the right leg. A few articles of clothing were found at the water's edge. These will be referred to later. Both women had been shot with a shotgun. The first woman found had been shot twice and the second either two or three times. Although the shooting was done at fairly close range there were no powder burns and the shot had not spread more than an inch or two. The wounds of the second body were described by an osteopathic physician as follows:

" 'one that entered the body from the left side and about three to five inches from the point of the shoulder and slightly to the front of the midline. . . . This load entered the chest and also on that side of the body was a part of the arm shot away; there was a similar wound on the left side of the body that was a little bit more toward the back; a shot that was made presumably with a shotgun, a torn opening about two and a half inches in diameter. This wound went into the chest, then there was another wound which involved the left elbow, it tore the elbow up considerably and there was evidence of a shot from that charge that tore the tissues on the front of the left breast.' "

The medical testimony further showed that the first body had been in the lake about twenty-four to forty-eight hours and the second forty-eight to seventy-two hours. The bodies were well preserved due to the fact that the weather was very cold and rainy during that week and the water in the lake was extremely cold. Both remains were later taken from Camdenton to Columbia, Missouri, to the university medical building for preservation. The identification of these victims remained a mystery for a number of weeks. In fact the evidence in the record shows that they were first identified about the middle of May, a month after they were found. The defendant, at the trial, offered evidence in an attempt to discredit the evidence of identification. But reading the record discloses that the identifications were positive. We will discuss this later. Appellant was charged with the murder of his wife and in our statement we will confine ourselves principally to the evidence tending to prove his guilt of that charge. It may be well to segregate the evidence and state it under the points in dispute.

█ It is contended by appellant that the state failed to show a motive for the crime. The evidence revealed the following on this point: Appellant and his wife were married on July 23, 1940. For a number of years prior to and in April, 1944, they lived on a farm in Pettis county, Missouri, a few miles north of La Monte. The mother

of Mrs. Holland, Mrs. Fairfax, lived with them much of the time. It was not disputed, in fact the defendant offered evidence that his wife left him a number of times during these years and remained away for several months without letting her whereabouts be known. The evidence shows that this was not satisfactory to appellant. Before and after he was taken in custody he informed various persons inquiring about the whereabouts of his wife and mother-in-law that they had gone to Florida or Texas. The circuit clerk of Pettis county testified that Mrs. Holland had filed a petition for divorce on September 15, 1943, which was dismissed by her on November 17, 1943. Appellant says this evidence was incompetent and not admissible because the evidence failed to disclose any estrangement between him and his wife. We will refer to the admissibility of this evidence later. The recorder of deeds testified that by deeds executed in November, 1940, the property, that is the farm where the parties lived, was deeded to appellant and his wife as joint tenants. The title had been in appellant. As the title was vested at the time of the alleged homicide the survivor would take the whole title. As to the feeling between appellant and his wife the following evidence was offered: J. R. Shane testified that on March 29, 1944, while he was walking toward Sedalia from Syracuse, Missouri, appellant came along in a car and gave him a ride to Sedalia; that while in the car in the course of a conversation he told appellant that he was alone at home and batching; that appellant in substance said he just as well be batching because his folks were gone most of the time; that he, the witness, asked who his family consisted of and appellant answered that he had his wife and that his mother-in-law stayed with them much of the time; that appellant added, "he had just as well be batching because they were gone so much of the time and left him and it made him so damned mad, he had a notion to take his gun and blow their damned heads off and throw them in the river." The only evidence offered by defendant to refute that evidence was the testimony of a number of witnesses that he at that time owned a Chevrolet coupe while the witness, J. R. Shane, testified he rode with appellant in a Chevrolet coach. Appellant also introduced some evidence indicating that the coupe was in a repair shop at Kansas City on March 29. Another witness, a Mrs. Gregory, testified that Mrs. Holland had a conversation with her wherein the divorce proceedings and her being away were mentioned and Mrs. Holland made the following statement referring to her husband: "The s. o. b. found me this time, but the next time I leave him he won't find me." The evidence justified an inference that the feeling of appellant toward his wife was anything but kindly and that the wife's feeling toward appellant was no better. Such evidence is always admissible to show motive. A divorce proceeding may well have entangled the title to the farm and having his wife out of the way would end that question as well as the vexation of her

leaving him so often. The evidence of the title being in appellant and wife as tenants by the entirety was competent evidence on the question of motive. 40 C. J. S. 1162, sec. 232 and sec. 234 at page 1165. Likewise the fact that a divorce proceeding had recently been instituted, although later dismissed, was competent evidence. 40 C. J. S., sec. 228 (b) 1159. The contents of the divorce petition were not placed in evidence. We deem the evidence sufficient to sustain a finding of motive.

██ Next appellant insists that the evidence was insufficient to sustain the conviction, that is, that appellant was the guilty party, and also that the evidence failed to establish the venue in Pettis county. Appellant did not testify, and when we refer to his evidence we mean evidence given by witnesses testifying in his behalf. We will begin with some facts shown by the defense witnesses which in our opinion aided the state's case. It was shown that appellant had his Chevrolet coupe at a repair shop in Kansas City; that he had received word the repairs had been finished; that the repairs consisted in a general overhauling and painting; that appellant was in Kansas City on Thursday, April 13, 1944, paid for the repair work and took his car; that he had informed the repair man to fix the car so he could keep it. A witness testified that appellant and his wife, on Friday afternoon, April 14, purchased groceries from his store at La Monte. Sales tickets were offered to support this evidence. Another witness for appellant testified that appellant and his wife, in a Chevrolet coupe, stopped for him on the road between La Monte and the Holland home and permitted him to ride on the running board of the car to his, the witness' home, located between La Monte and the Holland home; that he, the witness, remarked whether Holland had a new car and the answer was that the old car had been painted. This witness also saw some groceries in the car. This was the last time Mrs. Holland was seen alive by any witness testifying in the case. This was also the last time appellant was seen until about noon the next day. The evidence showed that on Saturday, April 15, about noon, appellant appeared at a car dealer's place of business at Kansas City where he sold his Chevrolet coupe for $500.00. The witness, DeTarr, who purchased the car, stated appellant wanted the check made to himself because he wanted to buy some cattle; that he, the witness, refused this request because the title was in the name of Mrs. Holland, so the check was made payable to her. The endorsement of the check, Mrs. Mattie Mollie Holland, was in appellant's handwriting and was cashed by him at a Sedalia bank. The title certificate had been signed in blank by Mrs. Holland. Mr. DeTarr further testified that when the car was brought to him on the 15th it was rather dirty; that he had a man clean it and also had the trunk painted on the inside; that it was customary when a car was purchased for resale to have it thoroughly cleaned. After selling the

car appellant went to the man who had repaired it and he took appellant to the Union Station, appellant stating to him that he was going home by train. We next find appellant at Knobnoster, on the evening of April 15. A Mr. Pace testified that he took appellant home and that Charles Boyd rode with them. When they reached the Holland home the car was turned in the driveway and left standing in the road because it was very muddy. Holland, Pace and Boyd went to the kitchen door which Holland opened. It was then dark and Holland lighted a lamp and the parties went upstairs to get a fan which Pace had purchased. Holland then stated that he wanted to go to La Monte and would go in his pick-up truck. Whereupon Pace informed him that he and Boyd were driving to La Monte and he should go with them. This, he did. This visit to the home was the first time appellant was there, so far as the evidence disclosed, after the wife and mother-in-law disappeared. At least they were not there that evening. Both Pace and Boyd testified that appellant made no reference to his wife or mother-in-law, did not call to anyone when entering the kitchen or make any remark about anyone being at home. When the parties arrived at La Monte the first activity on the part of appellant was a conversation at a barber shop with a Tom Coward about buying a car. Appellant purchased the car, had it repaired on Sunday, April 16, and took it home on Monday, April 17. He was taken home from La Monte on Saturday evening by a friend and returned on Sunday in his pick-up truck. It was this Sunday and Monday that the bodies were found in the lake. Newspapers carried the news of the findings. A paper, the Sedalia Democrat, which carried the stories, was at that time being taken by appellant. The evidence justifies the assertion that appellant went about his business on the farm and did not in the least concern himself about the finding ▆▆▆ of the bodies. He made a statement later that he had not seen the papers. During the next weeks, a number of people who were witnesses, some for the state, others for the defendant, testified that appellant was asked where his wife and Mrs. Fairfax were. To this he made a number of different replies, saying he did not know, that they had left him again, or that they had gone to Texas or Florida and taken all their clothes with them with the exception of one fur coat. Others were led to believe that his wife and mother-in-law were at home. For example, one witness, Mrs. Chester Allen, testified that she had been negotiating with the Hollands with reference to purchasing a second-hand typewriter and that Holland came to her home on April 26 and said she could have the typewriter. This witness then asked defendant: "Is Mollie with you?" And appellant answered: "It's so muddy she didn't come in." On the last Sunday in April a Mr. and Mrs. Reed went to the Holland home for the purpose of having Mrs. Fairfax stay with Mrs. Reed's mother while they were away from home. Appellant was asked where Mrs. Fairfax was. Mr.

Reed testified that appellant made no direct reply; that his wife asked a second time and appellant replied that he thought she was in Florida and that his wife had left him again and taken all of her clothes with her. Another witness testified that about May 4 he was working for appellant and asked him where his cooks were; that he replied they had gone to Florida. The evidence disclosed that the Hollands had intended to make some repairs in the kitchen of their home. Material for this purpose had been purchased in the fall of 1943. Wallpaper was stored upstairs and some flooring was stored in the garage. A carpenter had been engaged to do this work. This carpenter had not wanted to do the work until good weather set in because he wanted to put a roof on the silo at the same time. The evidence showed that during the week of April 17 appellant engaged another carpenter, a painter and a paper hanger to do this work. Four men worked on the job. These men testified that appellant insisted the work must be done right away, so they agreed that if it rained and they could not work on their outside job they would do the work for him. The repairs were made on Saturday, Sunday and Monday, April 22, 23 and 24. A new floor was layed in the kitchen, new wallpaper hung and some painting done. The old linoleum on the floor and other material were taken out and burned. One peculiar incident appears in the record. A new door had been placed in the kitchen in January, 1944. This door was missing when the workmen began their repairs and another new door was installed. The hardware for this door was in the kitchen and was given to the carpenter by appellant. What became of the door placed there in January was not disclosed. George Eccles testified that during the summer he put a roof on the silo and that he had been engaged to do the repair work in the kitchen, but that it had been finished by the time he arrived at the Holland home. On May 16, Captain Hansen of the highway patrol went to the Holland home and talked with appellant. Appellant was asked whether he was acquainted with Wilson's camp at the Lake of the Ozarks, lake road 15, Zack Wheat's resort and a place operated by a Mr. Hymes. He denied knowing anything about these places and that he had ever been there. These resorts were all located near the Glaize bridge. The evidence disclosed that appellant had launched a boat into the lake at lake road 15 and had stayed at the resorts above mentioned numerous times, often with his wife. Appellant was taken to the Glaize bridge and then he admitted having been at one or two camps, but denied he had even been on lake road 15, where the evidence showed he had launched a boat and had had dealings with a motor repair man. The highway patrol department, through its experts, examined appellant's home and surroundings thoroughly. This work began about the middle of May. The only wearing apparel of appellant's wife and mother-in-law found at the home was a fur coat. Two ash heaps were found near the home

and the evidence was that they were accumulations of years. The upper portions thereof, which appeared new, were sifted, as well as the ashes from a stove upstairs and the kitchen stove. Numerous articles were discovered through this sifting. Among them were, as enumerated by the patrolmen, safety pins; straight pins; hooks and eyes, or dress fasteners; snaps and clasps as are used on gloves; buckles; thin wire; melted glass; a piece of burned rayon or silk and some metal arches from women's shoes. The officers also discovered tracks of a car leading to the edge of the sidewalk of the home. The tracks indicated they had been made while it was muddy. At the time the second body was discovered, ▇ a dress, a slip and one lady's hose were also found. There were holes in the slip and dress which corresponded with the gunshot holes in the body. Small spots of human blood were found on two kitchen chairs and scrapings from a crevice on the kitchen stove also showed the presence of human blood. Numerous other places were examined, including the car found at Kansas City, and nothing incriminating was found. The walls of the kitchen were thoroughly examined for stray pellets but none were located. The nearest habitation to the Holland home was that of Ed Patrick about one-fourth mile or so distant. Patrick was called as a witness for the defendant and testified that he did not see Holland drive his Chevrolet coupe during the latter part of March or first part of April and that he had never seen appellant in a Chevrolet coach. This was to refute the evidence of Shane. Patrick was asked, on cross-examination, if he had not heard noises toward the Holland home one evening during April which sounded like the report of the firing of a shotgun. His answer was that that had occurred some time the first part of April. He was asked to tell the jury what happened and he answered:

"A. Well, we were out in the yard and there were some airplanes flying up around over Mr. Holland's house. We heard, I would say the back fire of a motor. My wife says something is the matter with one of those airplanes. I says 'it sounds like a shot gun to me'. That is about all there was to it. I wouldn't say whether it was the back fire from a motor or—

"Q. You thought it was gun shots? A. It sounded like it." On redirect examination he stated as to the date that it could have been about the middle of April, then added, "Well, if you are trying to get at something, it was after Mrs. Holland disappeared." He further stated that he heard four or five such noises, then on recross-examination he stated that he did not remember just when Mrs. Holland disappeared and after some further examination he was asked:

"Q. And you heard what you said was shots and what your wife said was an airplane motor backfiring and after that you heard Mollie and Mrs. Fairfax had disappeared, isn't that correct? A. I don't know whether after that or not."

At this point a recess was taken by the court and after recess Mr. Patrick stated, in answer to questions by appellant's counsel, that he heard the noises about ten days or so after the disappearance of Mrs. Holland. Then on recross-examination he stated that the highway patrolmen had asked him about this occurrence some time in April and that he might have informed them he heard the noises about the middle of April. The weight of this evidence was for the jury. It seems that all the circumstances, as related by this witness, fixed the time and place the alleged reports of the gun were heard to coincide with the time Mrs. Holland disappeared. The only statement inconsistent therewith is the voluntary statement by the witness that he heard the noises after Mrs. Holland had disappeared. If he heard the noises after the news became generally known that Mrs. Holland had disappeared he could not have heard them until May, because it was then that the disappearance was first made known. As to the identification of the bodies of Mrs. Holland and Mrs. Fairfax the evidence disclosed that Mrs. Holland had, on August 30, 1943, applied for work in a factory in Houston, Texas. Her fingerprints and photograph with the application were introduced in evidence. These fingerprints corresponded with fingerprints taken from the body found on Monday, April 17. This body was also identified as being that of Mrs. Holland by her first husband and by Dr. Powers of Warrensburg and Dr. Dyer of Sedalia. Both of these doctors had treated Mrs. Holland. The first body found was identified as that of Mrs. Fairfax by a number of witnesses. One doctor testified that Mrs. Fairfax had a wound, or sore, on her leg near the knee. This is the leg that had been removed from the body. When the identifications were made by the doctors appellant was in Columbia in custody of the highway patrolmen. He asked to talk to the doctors. This he was not permitted to do until after the doctors had viewed the bodies. Dr. Powers testified at the preliminary hearing and his evidence was introduced at the trial, he being sick and unable to attend. His testimony was that he talked with the defendant at Columbia. As to what appellant said at the time the doctor testified as follows:

"A. He says: 'I am in a scrape or a hole', I do not remember which word he used, and 'I'll give you and Dr. Dyer one thousand dollars to help get me out of it.'"

"Q. He said he would give you one thousand dollars to get him out of that scrape? A. To help get him out of it." Dr. Dyer testified as follows:

"A. Well, Edgar wanted to know what we thought about it and so I didn't say much. Dr. Powers did most of the talking. Can I say what he said?

"Q. Was it in the presence of Holland? He was there too? A. Yes, sir.

"Q. All right, just tell what was said there? A. Dr. Powers said: 'Edgar, it looks like you are up against it' says 'I think you had better just come across,' says, 'that is your wife and that is your father-in-law.'

"Q. You mean 'mother-in-law'? A. Mother-in-law, yes. So, well, Mr. Holland says; 'How can you identify those, aren't they larger than they were after they had been in the water that long and certain degree of changes in the body' and so we didn't argue that point at all—I didn't—and then—

"Q. What was said then, doctor? A. Edgar wanted to know if we would clear it up for him; said 'he thought we both could if we would do it' and said 'he would be only too glad to pay us some money if we would do that for him.'"

J. F. Shaw of the highway patrol testified as follows:

"Q. Captain, directing your attention to a conversation you had with the defendant concerning the finger prints or some finger prints of his wife and the finger prints that were obtained from the body of the second body found in the Lake of the Ozarks, do you recall having a conversation with him about those? A. After I returned from Sedalia on Thursday morning, Ed said to me, he says 'Captain, they tell me the finger prints checked.' I says 'yes, that is right.' He says: 'Well, finger prints won't lie' and laid his head on the table and mumbled something else and I don't know what he said."

"A. I said 'it seems like everyone thinks that is Mollie and Mrs. Fairfax but you' and he raised up and sat there a minute and said it couldn't be them."

This witness further testified that appellant suggested having some professionals look at the bodies and that during this discussion appellant mentioned the name of Dr. Powers, which resulted in the calling of Dr. Powers. It was after this that Dr. Powers and Dr. Dyer were at Columbia, identified the bodies and had the conversation with appellant as heretofore related. Witness Shaw also testified that appellant went in to view the bodies while at Columbia. Note his testimony:

"A. He made two trips in there, the first trip or the first time he entered the room, he stayed in there a few minutes and looked as he entered the room, he looked at the larger body and went on over to the smaller one and looked at it for a few minutes and I called him outside and told him to come on out and get some air. We went over by the window and I said nothing to him. He says: 'I don't know, I don't know.'

"Q. He says: I don't know; I don't know?' A. Yes, and in a few minutes he went back into the room and I didn't talk to him immediately; when he came out of the room, but later he told me he

thought the smaller body was too heavy and the larger body too small to be Mrs. Holland and Mrs. Fairfax.''

The bodies were later claimed by relatives of Mrs. Fairfax and were delivered to them.

The record is barren of any evidence tending to prove that appellant made the slightest inquiry as to the whereabouts of his wife and mother-in-law from the date of their disappearance to the date of his trial. He was out on bond pending trial after the preliminary hearing. At the trial he introduced evidence, much of which has been referred to, which we think strengthened the state's theory. He offered some evidence which seems to us was for the purpose of throwing doubt on the identity of the bodies. For example: A relative of appellant testified that she had a conversation with Mrs. Holland about raising chickens and a garden in the spring of 1944; that Mrs. Holland informed her she was not going to do either, that she was not going to work but was going to Florida to play the part of a lady. She also testified that it was not unusual for Mrs. Holland to leave her husband for months at a time. Defendant also introduced evidence by the men who did the repair work at the house showing that they found nothing unusual in the kitchen or about the premises.

The question is, are the above facts and circumstances sufficient to sustain the conviction. We think so. Many of the facts proven are meager in themselves, but ▮▮▮ taken together they form a web so tight about the accused that there is no reasonable theory of escape. The facts are sufficient to prove a motive. A threat was made. Mrs. Holland was last seen going home with the defendant on the afternoon of April 14. Then there is the evidence of Patrick that he heard what he thought were four or five gunshot reports, and four or five shots were actually fired. Appellant's eagerness to have the kitchen repaired immediately after the bodies were found. Bloodstains on the kitchen chairs and stove. The numerous small articles, such as buttons, hooks and eyes and other articles evidencing that clothing had been burned. The disappearance of a practically new door. Appellant's hasty trip back to Kansas City on the 15th to sell a car which he had brought from Kansas City on the 13th and about which he had stated he wanted repaired so he could keep it. All of these circumstances coincide with the time the victims disappeared, that is the night of the 14th, and also coincide with appellant's conduct during and after that time. No witness saw appellant from the time he was riding home with his wife on the afternoon of the 14th until the noon of the 15th when he showed up at Kansas City. The distance from the Holland home to Kansas City is only about seventy-five miles. It was in evidence that the distance from Sedalia to the lake at the Glaize bridge is ninety miles. Then there is the utter indifference on the part of appellant as to the whereabouts of his wife and mother-in-law. He said nothing about them being away on the night of the

15th when he arrived home with the two men, later he led a number of people to believe his wife was at home, and to others who asked to see his wife or mother-in-law he said they had gone to Texas or Florida. Appellant's failure to make any inquiry when the news of the finding of the bodies was published in newspapers, his indifference as to the identity of the bodies when they were identified by others, his statements to the officers, his denial of being acquainted with the locality at the Glaize bridge, his statements to the doctors and offering them money to help him out of a scrape and his persistency that the bodies were not those of his wife or mother-in-law, are all circumstances coinciding with the physical facts shown and point to appellant's guilt. Then too there is the circumstance of the dismemberment of the bodies to destroy identification. This speaks loudly when considered with the fact that appellant insisted the bodies could not be identified. At no time did appellant suggest that his wife and mother-in-law could be found in Texas or Florida. The only reason for this could be that he well knew where they were. Appellant argues that no tracts were found on lake road 15, indicating that no car had been driven down that road. That fact, however, is entirely immaterial. The heavy rain on Saturday night may have obliterated the tracks on this gravel road, but be that as it may the two bodies were in the lake and were placed there by someone. They certainly did not commit suicide by drowning. Appellant says no marks of any gunshot were found in the kitchen. By the time such marks were sought for the kitchen had been entirely remodeled. Then too the evidence showed that the shots were fired at close range and the entire loads went into the bodies, except one which cut a gash across the abdomen of Mrs. Fairfax. Did the stray pellets from this shot go into the missing door?

Now as to the venue. We must take into consideration all of the above evidence in determining this question and we desire to add one or two observations. Mrs. Holland evidently was scantily clad when shot. A light house dress and slip were found in the lake near the body. Holes were found in these garments corresponding with the gunshot holes in the body. It was cold, rainy weather and the evidence of a number of witnesses was that the garments found would not have been worn outside during such weather. Certainly it is highly improbable that Mrs. Holland left home clad in this manner and was murdered by someone else. Then too if Holland is the guilty party, and we are of the opinion that the evidence justified the jury's verdict on that point, it is highly improbable that he would have induced his wife and mother-in-law to go out on that fatal night of April 14 and have taken with him the instruments used in the homicide and the dismemberment of the bodies. The car tracks leading up to the sidewalk are also a circumstance to show that the bodies were placed in a car at that point. Appellant says that no shotgun

was found at his home that was usable. Some time prior to the homicide a box of ''super-X'' shells were at appellant's home. ·Since the home was not searched until a month after the homicide appellant had plenty of time ▮▮ to cover up. A twelve gauge pump shotgun was found there. The evidence is rather vague as to whether it was usable or not. But whether it was out of condition when found does not mean that it was in such condition in April, 1944. We deem the circumstances sufficient to prove venue which may be shown by circumstantial evidence. 23 C. J. S., sec. 914 (b), page 172 and numerous cases cited under note 64, page 173; State v. Palmer, 281 Mo. 525, 220 S. W. 680, l. c. 682 (2, 3) ; State v. Burns, 48 Mo. 438.

▮ Circumstantial evidence cases vary widely. Appellant in his reply brief analyzed cases cited by the state and urged that in none of them were the facts and circumstances similar to the facts proven in the present case. We may concede that to be true. No two cases will be found to be alike. In some such cases the circumstances consist of only a few salient facts pointing to the defendant's guilt. ·In others we find numerous apparently insignificant facts, which may be likened to threads in a spider web, small and tiny in themselves, but when taken together form a case against a defendant stronger than the class of cases made up of a few main facts. Such is the case at bar. Even many of the facts proven by the defendant are entirely consistent with his guilt and dovetail with the facts proven by the state. We will summarize a few of the legitimate inferences supported by the evidence. Ill feeling existed between appellant and his wife. His utter lack of concern as to her whereabouts is strong evidence of this fact. The mutilation of the bodies to destroy their identity and the subsequent statements and conduct of· appellant which indicated that he was of the opinion the bodies could not be identified, his incriminating statements to the highway patrol and doctors, his denial of being acquainted with the region of the lake where the bodies were found, all these circumstances pointed to his guilt. They are consistent with each other and inconsistent with any reasonable theory of his innocence. Many other facts and circumstances could be summarized, but they have all been stated above and we deem them sufficient to prove the defendant's guilt as well as venue. The facts and circumstances in this case are in our opinion stronger than those proven in a number of circumstantial evidence cases where convictions were affirmed. See State v. Shawley, 334 Mo. 352, 67 S. W. (2d) 74; State v. Taylor, 347 Mo. 607, 148 S. W. (2d) 802; State v. Blackmore, 327 Mo. 708, 38 S. W. (2d) 32; State v. Kinnamon, 314 Mo. 662, 285 S. W. 62. We have examined cases cited by appellant in which this court held the evidence insufficient. They are State v. Pritchett, 327 Mo. 1143, 39 S. W. (2d) 794; State v. Richardson, 36 S. W. (2d) 944; State v. Archer, 6 S. W. (2d) 912 and others. Upon examination of these cases it will be found

that the facts and circumstances fall far short of what the state proved in. the case under consideration. .

■ Next appellant says that the trial court erred in failing to instruct the jury upon the law of murder in the second degree. It is contended that since there was no eyewitness to the act of killing it was mandatory upon the court to instruct on murder in the second degree. Sec. 4378, Mo. R. S. Ann., R. S. Mo., 1939, and a number of Missouri cases were cited as authority. The above section of the stat- ute has long been construed as not to require the giving of a second degree murder instruction where the evidence justifies a conviction of murder in the first degree only. In other words, there is no need for a second degree instruction unless the evidence so justifies. State v. Kyles, 247 Mo. 640, 153 S. W. 1047; State v. Erb, 74 Mo. 199. That rule is applicable even though the evidence be entirely circum- stantial. State v. Dickson, 78 Mo. 438, l. c. 451; State v. Page, 130 S. W. (2d) 520, l. c. 523 (1, 2) ; State v. McCracken, 341 Mo. 697, 108 S. W. (2d) 372, l. c. 374 (4, 5) ; 41 C. J. S., sec. 392, page 209. It is also well settled that the circumstances of the killing, as evidenced by the location of the wound and other facts attending the homicide, are legitimate circumstances to be considered in deciding the question of deliberation. State v. Cade, 326 Mo. 1132, .34 S. W. (2d) 82, l. c. 84, where this court said:

"All this evidence tends to show on the part of the defendant a fixed enmity against the boy; a careful preparation to conceal the character of his act, and self-satisfaction that he had accomplished the deed—circumstances sufficient to warrant the inference that the deed was premeditated and deliberate, and to authorize an instruction of murder in the first degree."

In State v. Page, 130 S. W. (2d) 520, l. c. 523 (1, 2) (3, 5), this court made the following comment:

■ "One of the circumstances from which deliberation may be made to appear is the manner of employment of a deadly weapon used upon a vital part of the body."

In State v. Duestrow, 137 Mo. 44, l. c. 90, 38 S. W. 554, l. c. 566, this court said:

"It is well settled at common law, still in force in this state, that, when a homicide is committed in circumstances of great barbarity and cruelty, such brutal malignity will supply the place of malice, and make the act of killing equivalent to a deliberate act of slaughter, —murder at common law, and murder in the first degree under our statute."

Again, in State v. Rasco, 239 Mo. 535, 144 S. W. 449, l. c. 461 (18, 19), this court said:

"It will not be seriously questioned but that the death of the four persons and the burning of the house were the act of the person who killed Oda Hubbell. If, in connection with the killing of Oda

Hubbell, the murderer also killed Mrs. Hubbell, that fact is competent, not only as part of the res gestae, but as bearing on the question of deliberation. The burning of the house and the attempted destruction of all the persons therein would be competent as tending to show efforts to conceal evidence of the killing of Oda Hubbell.''

We call special attention to the following cases: State v. Dickson, 78 Mo. 438; State v. Kenyon, 343 Mo. 1168, 126 S. W. (2d) 245; State v. Taylor, 347 Mo. 607, 148 S. W. (2d) 802; State v. Rasco, supra; State v. Rumfelt, 228 Mo. 443, 128 S. W. 737. In each of these cases the evidence was entirely circumstantial and convictions of first degree murder were sustained. In none of the cases was a second degree murder instruction given. In each case the court considered the question and decided that the circumstances disclosed first degree murder only and an instruction on second degree murder was properly refused. These cases definitely decided the point now before us. The inferences to be drawn from the evidence, as in the above cases, justified a finding that the homicide was murder in the first degree. Neither the state nor the defendant offered evidence which would authorize a second degree murder instruction. It is important to note that in this, as in many of such cases, for example, State v. Rumfelt, supra, the defendant claimed he did not commit the homicide, and of course, therefore, did not offer any evidence of justification or evidence to show a lesser degree of homicide.

Appellant cited a number of cases to support his theory. They are: State v. Kyles, 153 S. W. 1047, 247 Mo. 640; State v. Young, 99 Mo. 666, 12 S. W. 879; State v. Henke, 285 S. W. 392, 313 Mo. 615; State v. Minor, 193 Mo. 597, 92 S. W. 466; State v. Richmond, 12 S. W. (2d) 34; State v. Cade, 326 Mo. 1132, 34 S. W. (2d) 82; State v. McCracken, 341 Mo. 697, 108 S. W. (2d) 372; State v. Snow, 293 Mo. 143, 238 S. W. 1069; State v. Wampler, 58 S. W. (2d) 266. We have examined all of the above cases and discovered that in the Kyles case the court held deliberation could be shown by circumstantial evidence but that the state's evidence failed to do so. The state's evidence showed a killing with a deadly weapon and nothing more, while the defendant testified that the stab wound causing death was inflicted while he and the deceased were engaged in a physical combat. The case is clearly not in point. In the Young case the defendant had been assaulted and this court held a manslaughter instruction should have been given. In the Snow case the ruling was that the evidence failed to show a deadly weapon had been used. In the Wampler, Minor and Richmond cases the defendants were found guilty of murder in the second degree. It was, therefore, not necessary for the court to pass on the question now before us. In State v. Cade a conviction of murder in the first degree was affirmed. The defendant testified deceased assaulted him and claimed self-defense. A manslaughter instruction was given. The state's evidence was en-

tirely circumstantial and this court held that the location of the bullet wound, being in the back of the head, and the conduct of the defendant after the homicide were sufficient to convict him of murder in the first degree. In the McCracken case a conviction of murder in the first degree was affirmed. A second degree instruction was given. The point now under consideration was, therefore, not before the court. The evidence was all circumstantial, but the court held the circumstances sufficient to show deliberation and affirmed a conviction of murder in the first degree. In the cases above discussed, where convictions of murder in the first degree were sustained solely on circumstantial evidence, the opinions hold, as in the Dickson case, supra, that "It is only upon proof of an intentional killing, nothing more appearing, that the law will presume the homicidal act to be murder in the second degree." The rule further is, that if the state's evidence, even though circumstantial, shows murder in the first degree and the defendant offers no evidence of mitigation or justification, but simply pleads he did not commit the act of homicide, then the court need not submit the question of murder in the second degree. We therefore hold that under the authority of the above cases the trial court did not err in failing to submit a second degree murder instruction.

We have disposed of all of the points briefed ·by appellant and find no reversible error in the record. The judgment is therefore affirmed. *Bohling* and *Barrett, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.