STATE OF MISSOURI, Respondent, v. DOCK BOOKER, Appellant, No. 44274—276 S. W. (2d) 104.

Court en Banc, February 14, 1955.

Rehearing Denied, March 14, 1955.

*Robert L. Spelbrink* for appellant.

*John M. Dalton,* Attorney General, and *John S. Phillips,* Assistant Attorney General, for respondent.

[104]  WESTHUES, J.—Dock Booker, appellant in this case, was convicted by a jury in the Circuit Court of the City of St. Louis, Missouri, of murder in the first degree and his punishment was fixed at death.  From the sentence imposed, he duly appealed to this court.

Appellant, whom we shall refer to as defendant, was charged with having inflicted mortal wounds on Earl Harrison by shooting him on August 15, 1953.  From these wounds, Harrison died on August 21, 1953.  On this appeal, defendant's principal point is that the evidence was insufficient to sustain a verdict of murder in the first degree.  Many other complaints are found in the brief about alleged errors committed in the course of the trial.  The majority of these are so indefinite that it is difficult to determine what defendant is complaining about.  In view of the punishment assessed, we shall review the whole record to determine if the defendant had a fair trial.

The defendant claimed the shooting was accidental and also in self defense.  The evidence justifies the following statement of what occurred between defendant and Harrison on August 15, the day of the alleged fatal shooting.  Defendant and Harrison were baseball players; they were about the same weight and height and both were between 40 and 45 years old.  They had known each other and had met at taverns and other places and on several occasions had had arguments as to their respective effectiveness as pitchers.  About 2:00 o'clock on the afternoon of August 15, the defendant went to Vic's Tap Room, a tavern located at 2518 North Taylor Avenue, St. Louis, Missouri.  There were a [105] number of people in the tavern. · Defendant seated himself at a table and had a number of drinks.  About 2:45 or 3:00 o'clock, Harrison, the deceased, also went to the tavern.  Harrison seated himself on a stool at the bar and ordered a bottle of beer.  Defendant, at this point, left the table

where he had been seated and went to Harrison and asked him to buy a drink. Harrison replied, "I'm not going to buy you a God Damn thing." Defendant retorted, "As many drinks as I've bought you, and you won't buy me one." The evidence was that Harrison did not get to drink his beer because the argument became heated and Fred Mitchell, the man in charge of the tavern, ordered the two to leave. He put the defendant out at the front door onto Taylor Avenue, and Harrison out at a side door into a narrow alley or "gangway" which led into a main alley which ran north and south between Cottage and Kennerly. The deceased turned north at the main alley and was next seen at Cottage Avenue, the next street to the north. The defendant was seen walking north on Taylor. A sister of the defendant operated a "little lunch counter" in the rear of a tavern referred to as Sugar Ray's place which was located at 2526 North Taylor, a short distance north of Vic's Tap Room. The defendant's sister, Rena Jackson, testified that she had had the lunch counter at Sugar Ray's for some time; that her brother, the defendant, had left a loaded pistol with her which she kept under a counter in the place. Defendant testified that after he left Vic's Tap Roor, he went to Sugar Ray's place and took the gun and placed it in his pocket. The defendant and the deceased were next seen at the place where Harrison was shot (the mouth of the alley at Cottage Avenue). A nephew of the defendant, James Biggs, testified for the State. His testimony was that he saw his uncle and another man in the alley and that he went up to where they were. He testified as follows:

"Q. Did you have an occasion to go over there where your uncle was?

"A. Yes.

"Q. And now tell the court and jury in your own words, please, what if anything you saw and did at that time?

"A. Well, I went over—I seen him and another fellow over there in the alley; I went over there in the alley; the fellow was sitting down on the stone next to a pole. My uncle slapped the fellow and the fellow got up and he slapped him again.

　　　　　*　*　*　*　*　*　*　*　*　*

"Q. And then what happened?

"A. The fellow stood up and my uncle shot him.

"Q. Now then, did you have any conversation with your uncle at that time?

"A. Well, I told him, I said, 'Buddy, let the fellow alone.' He didn't say anything and I asked—

"MR. SPELLBRINK: I object to that as a self-serving statement, if the Court please.

"THE COURT: Overruled.

"Q. Did you see a gun in your uncle's hand at the time it was fired?

"A. Yes.

"Q. In what hand did he have the gun, please?

"A. He had it in his right hand.

"Q. Can you tell us whether or not during the time that your uncle was—what if anything during the time that your uncle was slapping this fellow who was shot, what if anything this fellow said or did?

"A. Well, I didn't see him do anything."

A witness, Rosella Mathews, testified that on August 15, at about 3:30 P.M., she was in a room at 4459 Cottage Avenue, the home of a Mrs. Bramblett; that she was dressing Mrs. Bramblett's hair; that she was facing a window and saw what occurred between the defendant and the deceased at the alley. Note her description of what she saw and heard:

"Q. While you were looking out of the window, tell the court and jury what, if anything, you saw and heard.

"A. Well, when I looked out the window I saw these men walk up and [106] when they walked up this elderly man was sitting on a rock and this Dock Booker, he came up to the man and he said, 'You think you're smart,' and then he slapped him, and he repeated that several times and slapped him several times, and then the man, he stood up, the elderly gentleman, he stood up and he said, 'Go on and let me alone, I'm not bothering you,' just like that. He said, 'No, you just think you're smart.'

"Q. And then what happened, please?

"A. Then he just walked over to him and shot him.

"Q. Can you tell the court and jury, Mrs. Mathews, whether or not at any time during this altercation that you have just described you saw this fellow who got shot, with any weapon or anything in his hands?

"A. No, sir, I did not.

"Q. Can you tell us what, if anything, this fellow who got shot did to protect himself?

"A. Not one thing.

"Q. And can you tell us whether or not this fellow who was shot made any threat to him?

"A. No, sir, he did not."

The evidence was that four men were present when the shooting occurred: the defendant, the deceased, James Biggs, and a fourth man unknown to Biggs. The evidence does not show who this man was. The State's evidence, if true, was sufficient to sustain a verdict of murder in the first degree. In fact, the evidence did not justify any other finding.

The defendant testified that before the shooting the deceased had an open knife in his hand and threatened him and told him to stay off Taylor Avenue; that he, the defendant, told the deceased to stop; that he, the defendant, took the gun from his pocket and showed it

to the deceased thinking that would stop him but that deceased advanced with the open knife; that a scuffle followed and the gun was accidentally discharged. Defendant was asked if he had signed a statement about the shooting and he denied he had signed a statement. He was shown a statement and then defendant stated he had forgotten about it and admitted he had signed the statement. The statement was offered in evidence in its entirety at defendant's suggestion.

In this statement, defendant stated that he shot the deceased in self defense. No scuffle was mentioned therein. In the statement defendant was asked, "How far from him were you when you fired the shot?" His answer was, "About three steps from him." The doctor who examined the deceased and treated him during the few days he lived testified that the bullet entered the body on *the left side more to the back* "Just at the lower border of the rib cage, where the ribs end down there." (Italics ours) .

No witness corroborated the defendant in support of his theory of self defense or that the shooting was accidental. Not a witness was called by the defendant. He was the only witness. We must rule that the evidence was ample to support a finding that defendant was guilty of murder in the first degree. State v. Page, Mo., 130 S.W. (2d) 520.

The trial court submitted the case to the jury by instructions authorizing a verdict of guilty of murder in the first degree, in the second degree, or manslaughter. The court also instructed the jury authorizing a verdict of not guilty if the shooting was in self defense or if it was accidental.

Defendant complains that the instruction submitting murder in the first degree was incorrect because murder in the first degree was defined "as wilfully, deliberately, premeditatedly, malice and malice aforethought." It is claimed that the instruction was indefinite, improper, conflicting, and a comment on the evidence. The instruction follows the wording of the statute, Section 559.010, V.A.M.S. The portion of the instruction complained of reads as follows: "* * * the Court instructs the jury that if you believe and [107] find from the evidence, beyond a reasonable doubt, that the defendant * * * wilfully, deliberately, premeditatedly and of his malice aforethought, did shoot one Earl Harrison * * *." The instruction also defined the terms "wilfully," "deliberately," "premeditatedly," "malice," and "malice aforethought." The instruction is in proper form.

Defendant also complains that the instruction did not state "and thereby inflicting upon Earl Harrison a mortal wound, of which said wound Earl Harrison within a year and a day thereafter died, etc." We find no basis for such complaint. The instruction contains substantially the very words which defendant says were omitted. Note the wording of the instruction: "* * * and that within a year and

a day thereafter, to-wit, on the 21st day of August, 1953, he died from the effects of such shooting, * * *.''

So it is with many of the complaints in the motion for new trial and in the brief. They are either indefinite or the record does not support the complaint made. For example: the motion for new trial states that the evidence failed to show the venue of the crime charged. That fact was proven by a number of witnesses and also by circumstantial evidence. One of the witnesses to the shooting was asked whether the events to which she had given evidence ''happened here in the City of St. Louis, is that correct?'' She answered, ''Yes, sir.'' Venue may be proved by circumstantial evidence. State v. Holland, 354 Mo. 527, 189 S.W. (2d) 989, l.c. 996, 997 (6, 7); State v. Cobb, 359 Mo. 373, 221 S.W. (2d) 745, l.c. 747 (3-5); State v. Palmer, 281 Mo. 525, 220 S. W. 680, l.c. 682 (2, 3); 23 C.J.S. Criminal Law, Section 914, Subsection b., p. 172.

In the last point briefed, defendant complains that the trial court refused to grant a new trial on newly discovered evidence. Defendant's attorney filed an affidavit that he did not discover the evidence until after the trial. The newly discovered witness signed a sworn statement that he saw the killing as he passed by the street and alley, but did not give his name to the police or to the defendant or anyone else; that after he heard defendant had been convicted, he visited defendant in jail on January 14, 1954, and informed him of what he had seen on the day of the shooting; that defendant told him to go to see his lawyer; that he did so and that the lawyer prepared the affidavit setting forth what the witness knew of the shooting.

The trial court heard arguments on the motion and considered the affidavits pertaining to the newly discovered evidence and overruled the motion. The question before us is whether the trial court's ruling was an abuse of discretion. State v. Stroud, 362 Mo. 124, 240 S.W. (2d) 111, l.c. 113 (5, 6); State v. Brown, Mo., 245 S.W. (2d) 866, l.c. 868 (9, 10); State v. Brotherton, Mo., 266 S.W. (2d) 712, l.c. 718 (9)(10). In passing upon the motion, the trial court made some comments which indicated his consideration of the question of whether the newly discovered evidence would probably produce a different result. The trial court was in a better position to judge this matter than this court. However, the record in this case shows that the alleged newly discovered evidence is inconsistent with the physical facts and contrary to all the evidence of witnesses in the case, including some of the evidence of the defendant. In fact, when all the evidence is considered in connection with the affidavit, it leaves a doubt as to whether the newly discovered witness saw or heard what he claims in the affidavit. We hold that the motion for new trial was properly overruled.

The indictment in this case is in proper form; the defendant was represented by an attorney; a jury trial was had; the verdict is

legally sufficient; the motion for new trial was argued by counsel and considered by the trial court before it was overruled. We find no reversible error in the record. The judgment is affirmed. The date of the execution is ordered on and for Friday, the 1st day of April, 1955. All concur.