**STATE of Missouri, Respondent,**

v.

**Charles Stoyan CUCKOVICH, Appellant.**

**Nos. 56770, 56771.**

Supreme Court of Missouri,
En Banc.

Sept. 11, 1972.

Rehearing Denied Oct. 9, 1972.

John C. Danforth, Atty. Gen., Michael L. Boicourt, Asst. Atty. Gen., Jefferson City, for respondent.

Larry O. Denny, Kansas City, for appellant; Darragh Kasakoff, Kansas City, of counsel.

HOLMAN, Judge.

Defendant, Charles Stoyan Cuckovich, was indicted on two charges of first degree murder. He was alleged to have shot and killed James William Lindsay and James Richard Lindsay. Upon motion of defendant the two cases were consolidated. A jury trial resulted in a verdict of guilty on each charge and the death penalty was assessed. See §§ 559.010 and 559.030.[1] Defendant has appealed.

The evidence adduced supports a finding of the following facts: James Richard Lindsay and his wife Jackie lived in a mobile home located on property adjacent to the home of his father, James William Lindsay. We will hereinafter refer to the son as Richard, and the father as William.

At about 8 p. m. on January 8, 1970, Richard and Jackie were in the bedroom of

1. Statutory references are to RSMo 1969, V.A.M.S.

their mobile home watching television. According to the testimony of Jackie, she heard a noise like metal against metal and some clicking and saw a man (later identified as defendant) enter a normally unused door of their trailer, which was always kept locked. He looked into a dark bathroom and then turned and walked toward the bedroom. She stated that there were lights on in the kitchen and a light in the living room; that her husband then went toward the intruder and said, "What are you doing here, what do you want", and then Richard "jumped him"; that she then yelled, "Get the gun, get the gun," and at that time two more men ran in the door; that they were down on the floor and one man was standing there with a gun pointed to the floor; that about that time she jumped out the door and ran to her father-in-law's house; that as she was running to the house she heard a shot; that she pushed in the door of her father-in-law's house and told what was occurring and her father-in-law and Gerald, another son, ran out towards the trailer. She stated that defendant was a white man 50 to 55 years old, had gray hair, and wore dark glasses; that she was shown various photographs by the police but did not identify anyone from them; that after defendant was arrested and in custody she saw his picture on television and identified him as the man who first entered the trailer. She also identified him in the courtroom.

Gerald Lindsay testified that after Jackie came to their home screaming as to what was occurring in the trailer he followed his dad out the door, at which time they heard a shot; that his dad told him to get a gun and on the way back to the house to get the gun he heard another shot; that he obtained a 20-gauge shotgun and as he came back he heard someone crossing the fence behind Mr. Parker's house; that he saw two people going up Parker's drive and fired three shots at them; that he then went back and found that his father and brother were dead.

Reuben Parker, a next-door neighbor, testified that he heard the shots and then saw three men walking past in his driveway; that he asked them what had happened and they said "Nothing"; that about that time Gerald fired three shots and shortly thereafter he heard a car door shut and a motor speed up as if it were sitting there idling but he didn't see the car; that he didn't see the faces of any of the men well enough to recognize them.

It appears from the testimony of Andrew Hansen, his wife Marjorie, and his son Paul that they lived "catercornered" across the street from the Lindsays; that on the night of the killings, at a time estimated at around eight o'clock, two men banged on their back door and one of them said, "We have been in a bad accident. My friend's hurt bad, we have got to get him to a hospital"; that Mrs. Hansen then aroused her husband who was asleep and he got dressed; that the Hansens later identified the two men as defendant and Mr. Booth, who was also arrested and tried for these murders. There was testimony that defendant, while at the Hansen home, was dripping blood from his hands and was given paper toweling to wipe off the blood; that Andrew Hansen agreed to transport the two men in the Hansen car. Andrew testified that when they got to his garage he noticed two police cars down the street and suggested that the men get the police to take them to the hospital; that Booth then pulled him behind a tree and exhibited a gun and said, "Get us out of here or I'll kill you"; that he drove the men to Holmes Street where he was ordered to stop; that when he got out of the car one of the men took the keys and the two men then drove off in his car. The abandoned car was thereafter recovered. As will hereinafter more fully appear, all of the Hansens, prior to defendant's arrest, tentatively identified defendant as being one of the men who came to their home on the occasion in question. Later they positively identified him in a lineup and also at the trial.

Defendant was arrested on April 5, 1970. The police had learned that defendant was

staying at the apartment of his wife who was also known as Virginia Cook. They went to the door of the apartment and identified themselves and were admitted by Virginia. They found defendant in the bedroom and arrested him; they then noticed a .38 caliber pistol on a dresser three to five feet away from defendant. They seized the gun and also a pair of glasses. As indicated, defendant was placed in a lineup the next day and was identified by a number of witnesses. There was also testimony that defendant had type A blood, and that blood on the paper toweling used in the Hansen home, and on a tissue found where defendant was sitting in the Hansen automobile, were found to be type A blood. Fingerprint technicians were unable to find any fingerprints that matched those of either defendant or Booth.

Defendant offered no evidence.

The first point briefed is that "the court erred in admitting evidence obtained by the warrantless arrest, search, seizure and exhibition of appellant in a lineup in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States." Both sides agree that defendant cannot prevail on this contention if the arrest of defendant was valid. Since there was no warrant the validity of the arrest depends upon the existence of probable cause. Defendant has briefed this point upon the theory that the evidence adduced on the hearing of the motion to suppress did not disclose any basis for the officers to have had probable cause for the arrest. As will hereinafter appear, we do not agree.

" 'The existence of probable cause for an arrest must necessarily depend upon the facts of each particular case. "The existence of 'probable cause', justify an arrest without a warrant, is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. It is a pragmatic question to be determined in each case in the light of the particular circumstances and the particular offense in-

volved." 5 Am.Jur.2d, Arrest, § 48, p. 740.' State v. Seymour, Mo.Sup., 438 S.W.2d 161, 163. Although the evidence need not be as substantial as that required to support a conviction, probable cause does require a reasonable ground for belief of guilt. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879." State v. Pruitt, Mo.Sup., 479 S.W.2d 785, 788.

We have concluded that the police had probable cause for arresting defendant. Four witnesses who had seen the men who committed the murders at about the time of the occurrence had given the police descriptions which, at least in a general way, matched defendant's actual appearance. Moreover, members of the Hansen family had made a tentative identification of defendant from a photograph shown them by the police. After having viewed many photographs over a period of three months they had picked out defendant's photograph as one which "looked like" one of the men who had come to their home on the night in question. As stated, we think the evidence was sufficient to constitute probable cause and hence the trial court did not err in overruling the motion to suppress or in subsequently admitting the evidence at the trial.

Defendant's next contention is that the court erred in overruling his motion to suppress his identification by the Hansens because he was exhibited to them under suggestive circumstances in violation of the Fourteenth Amendment to the U. S. Constitution. The question thus presented is whether "the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification that he [defendant] was denied due process of law." Stovall v. Denno, 388 U.S. 293, 301, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199. Defendant complains of the fact that Andrew Hansen was shown a group of photographs on January 10, 1970, which included one of defendant and defendant was not identified, while four months later he was shown another group with a different photograph of de-

fendant which Hansen did tentatively identify; also, that the lineup did not contain other persons whose appearances were similar to defendant.

■ We have concluded that this point is without merit. We see nothing improper in the action of the police in exhibiting to a witness two different photographs of defendant, particularly since four months intervened between the exhibitions. As to the lineup it should be noted that No. 4 in the lineup was Booth, another suspect, and it was proper that some of the men should resemble him. Defendant was No. 2. The ages of the men in the lineup (in order) were 55 years, 57 years, 52 years, 40 years, 58 years, and 38 years. Their heights were 5′ 9″, 5′ 8″, 5′ 11″, 5′ 11″, 5′ 9½″, and 6′ 3″. All the men were white and all were at least partially gray. In connection with this point it should be borne in mind that the police have a practical problem in preparing a lineup. They are largely restricted to other prisoners and members of the police force and may find it difficult to get persons who look very similar to the suspect. Defendant places great reliance on the fact that one of the men had palsy and another was much taller than the other men. Defendant has cited the case of Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L. Ed.2d 402, in support of his contention. We have considered that case and find that it is factually distinguishable because, in Foster, there were two lineups and a personal interview between the suspect and the witness before an identification was made.

As indicated, we find that there were a number of men in the lineup whose age, size, and characteristics were similar to defendant's and we accordingly rule that the lineup was not unnecessarily suggestive.

■ It is also defendant's contention that the court erred in overruling his motion to quash the grand jury indictments. The motion was based upon the alleged fact that the grand jurors were all employed civic leaders and hence were not peers of defendant. He indicates that there should have been some unemployed indigents and perhaps a Mexican thereon. The evidence does not support defendant's contention. The grand jurors are selected from a "wheel" containing 600 names chosen, according to § 497.260, by the circuit judges of Jackson County. While the jury commissioner testified that the panel is generally composed of people outstanding in civic affairs, the only circuit judge who testified stated that he made an effort to select people with different occupations, experiences, and background; that he included women and Negroes.

■ This motion to quash was also properly overruled under the provisions of §§ 540.060 and 540.070, which restrict the grounds for challenge and provide that the objection be made before the jury is sworn. In that connection, however, we observe that we do not consider it essential to a lawful grand jury that it necessarily include persons who are indigent or unemployed.

■ It is next contended by defendant that the court erred in overruling his application for a continuance. The application (filed on the morning the case was set for trial) alleged that defendant's wife, "a material witness for the defendant is ill with a high temperature (fever) and broncopneumonia is suspected, that as a result of such illness said witness is unavailable to testify for defendant." The only proof offered in support of the application was a letter from a doctor. It was excluded upon objection that it was hearsay and defendant apparently did not make any effort to bring in the doctor or offer any other proof. We note also that the application failed, in many respects, to comply with S. Ct. Rule 25.08(b), V.A.M.R., and that, in itself, was sufficient ground for denying it. Moreover, "the trial court has great discretion in granting or denying a continuance, and 'it requires a very strong showing to induce the higher court to interfere, and it

will disturb the action of the trial court only where a clear abuse of discretion is shown.'" State v. Thomas, Mo.Sup., 433 S.W.2d 537, 539. We find no abuse of discretion in this instance and accordingly rule this point adversely to defendant.

■ The next point briefed by defendant is the contention that the court erred in overruling his challenge for cause of veniremen Byrd and Looney. Mr. Byrd had stated that his son had formerly been a policeman, and Mr. Looney stated that he had a friend and a brother-in-law that held law enforcement positions. Both men indicated on voir dire that they might give more weight to the testimony of a policeman than to other witnesses, as shown by the following:

"MR. DENNY: Would you tend to give any more weight and credibility to the testimony of a police officer than you would any other witness because your son has been a police officer? VENIREMAN BYRD: Possibly so. THE COURT: The test, Mr. Byrd, is whether or not you could give both the State and the defendant a fair trial. Would you base your verdict on the evidence that comes from the witness stand and the instructions given you by the Court? Now, that's the test. VENIREMAN BYRD: Certainly that would be my attitude, yes. THE COURT: You would base your verdict solely on the evidence and the instructions, is that correct? VENIREMAN BYRD: Yes, sir. * * *

"MR. DENNY: As a result of your discussions with them, does it tend to give you any kind of an outlook that would make it difficult for you to sit as a fair and impartial juror in any way? VENIREMAN LOONEY: I don't really know. I'm afraid it would. * * * THE COURT: Well, only you can tell us, Mr. Looney, and in fairness to both sides in this case, the question is whether or not you have a preconceived notion in the matter because you happen to have a relative or friend who does police work? Now, the question is: Can you listen to the evidence and listen to the instructions, and base your verdict on that evidence and those instructions? VENIREMAN LOONEY: I should be able to. * * * THE COURT: Mr. Looney, I am going to ask you one more question. Could you be fair in sitting as a juror in this case to both the State and the defendant? VENIREMAN LOONEY: I think so."

■ Defendant complains that he was required to use two of his peremptory challenges in order to remove these veniremen from the panel. There is no question but that defendant was entitled to a full panel of qualified jurors before being required to make his peremptory challenges. State v. Kirkpatrick, Mo.Sup., 428 S.W.2d 513.

There are no Missouri cases cited which involve the precise question here presented. Defendant's contention is supported, to some extent, by federal cases such as Sellers v. United States, 106 U.S.App.D.C. 209, 271 F.2d 475. In that case (in which virtually the entire case for the prosecution was based on the testimony of police officers) it was held reversible error for the court to refuse a request that the panel be asked whether " 'any of the jurors [are] inclined to give more weight to the testimony of a police officer *merely because he is a police officer* than any other witness in the case.' " 271 F.2d 476. In that connection the court stated that a " 'defendant cannot be fairly tried by a juror who would be inclined to give unqualified credence to a law enforcement officer *simply because he is an officer.*' " 271 F.2d 476.

■ On the other hand, it is well established in this state that the trial court "has a wide discretion in determining the qualifications of a venireman and its decision thereon should not be disturbed except for a clear abuse of discretion. State v. Jones, Mo., 384 S.W.2d 554, 558 [1, 2], and cases there cited. In State v. DeClue, Mo., 400 S.W.2d 50, 57 [14], this court said: 'Certainly a clear line of demarcation cannot be drawn as to when a

challenge for cause should or should not be sustained. Some cases will be ones where an appellate judge might have done differently but at the same time cannot say that there was an abuse of discretion * * *.' Each case must be judged on its particular facts. A determination by the trial judge of the qualifications of a venireman necessarily involves a judgment based on an observation of the demeanor of the venireman and, in the light of that observation, an evaluation and interpretation of his answers as they relate to whether he would be fair and impartial if chosen as a juror. The trial judge is in a far better position to make that determination than are we from the cold record." State v. Harris, Mo.Sup., 425 S.W.2d 148, 155.

We think this case may be distinguished from Sellers upon two grounds. First, because the question involved in Sellers was not the form of the question propounded in the case at bar, and, secondly, while there were a number of police witnesses in this case the more important evidence (unlike Sellers) was obtained from witnesses other than the police. It should also be noted that both Byrd and Looney indicated in response to questions by the court that they would accord both sides a fair trial and would base their decision on the evidence and the court's instructions. In view of the foregoing we rule that the trial court did not abuse its discretion in failing to sustain the challenges in question.

█ Defendant also contends that the trial court committed prejudicial error in admitting in evidence the .38 caliber revolver taken from a dresser in the room at the time defendant was arrested. This weapon was not identified as the one used in killing the Lindsays and defendant says that it had no probative value and served only to arouse passion and prejudice on the part of the jury. The gun in question was clearly connected with the defendant and was of the same caliber as the one used in the killings. Expert testimony indicated that the bullets taken from the bodies, and test bullets fired from this gun, had the same general characteristics; that they had some points of individual characteristics but that the murder bullets could not be positively stated to have been fired from the gun in evidence because its barrel had been mutilated by some type of sharp instrument.

We have concluded that since the gun was in the possession of defendant at the time of his arrest and was shown to be similar to the murder weapon, it was properly admitted in evidence. "[A] weapon or instrument found in the possession of accused or of his criminal associates which, although not identified as the one actually used, is similar in form and character thereto, or which, from the circumstances of the finding justifies an inference of the likelihood or possibility of its having been used, is admissible for the purpose of showing availability to accused of the means of committing the crime in the manner in which it is shown to have occurred * * *." 22A C.J.S. Criminal Law § 712, p. 966. See also State v. Richetti, 342 Mo. 1015, 119 S.W.2d 330.

In support of his contention defendant has cited State v. Wynne, 353 Mo. 276, 182 S.W.2d 294, but that case is readily distinguishable because the gun admitted in that case was not shown to have been connected either with the defendant or the offense.

█ In the testimony of Detective Thurman concerning the arrest of defendant, the following appears: "Q. And when you got out there then, would you tell the jury what you did? A. When we arrived at that location, we had information previous to this Charles Cuckovich living at this address, and at this time we weren't sure what name he was using. He has used in the past— * * * MR. DENNY: Your Honor, I am going to move that a mistrial be declared on the basis of this defendant's character has been assailed by this officer's testimony, that this man obviously used different names." The court overruled the motion for a mistrial and defendant now asserts that the testi-

mony and ruling constituted prejudicial error. The case cited by defendant, State v. Hampton, Mo.Sup., 275 S.W.2d 356, does not support his contention because there the evidence was assumed to have been erroneously admitted but was held not to have been prejudicial.

We think it is significant that the only relief defendant sought was a mistrial. It is our view that he should have asked also that the statement be stricken and the jury ordered to disregard it. In that way the court could have considered corrective action short of a mistrial. This court has said that "[e]very error which might occur in the trial of a case does not necessarily require the granting of a mistrial. State v. Camper, Mo., 391 S.W.2d 926. The declaration of a mistrial is a drastic remedy, and the power of a trial court in this respect 'should be exercised only in extraordinary circumstances,' State v. James, Mo., 347 S.W.2d 211, which is another way of saying that 'a mistrial should be granted only when the incident is so grievous that the prejudicial effect can be removed no other way.' State v. Camper, supra. For these reasons the declaration of a mistrial necessarily and properly rests largely in the discretion of the trial court who observed the incident giving rise to the request for a mistrial, and who is in a better position than an appellate court to evaluate the prejudicial effect and possibility of its removal short of a mistrial. The proper function of an appellate court in the situation we have before us is to determine whether as a matter of law the trial court abused its discretion in refusing to declare a mistrial." State v. Smith, Mo.Sup., 431 S.W.2d 74, 82, 83.

It is our view that the court did not abuse its discretion in denying the motion for mistrial and we accordingly rule this point against defendant.

In his cross-examination of Detective Thurman defendant's attorney brought out the fact that a photograph of defendant was exhibited to Andrew Hansen on January 10, 1970, and that he (Hansen) did not

identify defendant as one of the men involved. Thereafter, on redirect, the assistant prosecuting attorney had the witness identify that photograph and also the one which Hansen tentatively identified in April of 1970, and they were admitted in evidence so they could be compared by the jury. Defendant objected to the admission of the January "police photograph" mainly because it had on its face the date it was taken (9–14–61). He claimed then, and now claims, that the portion showing the date should have been taped over so the jury could not see it and perhaps conclude that defendant had been previously arrested. It is pointed out that that procedure was followed in State v. Crossman, Mo. Sup., 464 S.W.2d 36.

When the objection was made the court, in overruling it, said: "The fact is that you have caused this jury to be told in effect that the witness saw a photograph of this defendant and did not identify him, and the date and the circumstances of the taking of the picture, the fact that it was taken nine years before becomes significant, and the defendant having opened up the matter, the condition and circumstances of the photograph become significant." Defendant here concedes that it was not error to admit the photograph but contends that the date and police number on it should not have been seen by the jurors. We agree with the view of the trial court that it was very important to show that the photograph was nine years old, which would tend to explain why it was not identified. Defendant did not object, at the time it was offered, to the fact that a police number was on the photograph and hence cannot urge that objection here.

We rule that the trial court did not err in admitting this photograph in evidence with the date of its taking being visible thereon.

The next contention will appear from the following quotation from defendant's brief: "Counsel for the State introduced, through Sergeant Don Lyon [of

the] Kansas City, Missouri, Police Department, testimony as to the blood type of the appellant. When it was determined this testimony was based on hearsay, counsel for appellant moved to strike this testimony and requested that the jury be instructed to disregard it because it was hearsay and of no probative value. The trial court indicated it would sustain the objection and instruct the jury to disregard such testimony but that it would allow the State to bring in the medical records of the United States Penitentiary at Leavenworth, Kansas, to prove the blood type of the appellant. * * * Counsel for appellant was forced to withdraw this valid objection to the hearsay or submit to introduction of highly prejudicial and improper records from a federal penitentiary which would have informed the jury the appellant had a prior record of conviction. Such action by the trial court was a flagrant abuse of discretion and erroneous. Appellant had to give up his Sixth Amendment right of confrontation of the hearsay testimony or suffer from the admission of highly prejudicial evidence concerning the character of the appellant."

During the discussion (out of the hearing of the jury) at the time the objection was made counsel for the State offered to have a sample of blood taken from defendant during a recess if he would consent. Defendant refused to consent and it therefore appears that the State had no other method of proving his blood type than by the records indicated.

We do not think the action of the court constituted error. It properly indicated that it would strike the hearsay testimony upon defendant's motion. The court was not required to make a ruling on the medical records until offered, but in fairness to the defendant did indicate that they would be admitted. Counsel for defendant was then faced with the necessity of a decision of trial strategy and made what appears to be a prudent one. Defendant's attorney apparently expected the court to strike the

inadmissible evidence and also to exclude admissible evidence on the same subject. Such action would have been unfair to the State. We accordingly rule this point against defendant.

It is also defendant's contention that "the evidence was insufficient to support convictions of murder in the first degree [and also that] the court erred in refusing to give the instructions offered by the appellant on murder in the second degree." In support of his position defendant relies primarily upon the general rule "that a presumption of murder in the second degree arises from an intentional killing of a human being by another where a deadly weapon is used by him at a vital part of the body, absent proof of other facts tending to show deliberation to raise such killing to first degree murder." State v. Snow, 293 Mo. 143, 238 S.W. 1069, 1071. It seems to be his position that since there were no eyewitnesses to the actual shooting of the Lindsays the presumption of second degree murder would necessarily apply. Defendant also mentions that two of the men were shown to have had injuries shortly after the shooting, and we assume he contends that Richard struck them in the fight in the trailer and thus furnished provocation for his killing. In our discussion of these points we will refer to defendant as having been armed and having done the killing which, of course, is based on the proposition (as the court instructed the jury) that "an offense committed jointly by two or more persons is the act of each and all and whatever any does in furtherance of the unlawful act is in law the deed of each." We also have in mind that in determining whether a submissible case of first degree murder was made we view the evidence in the light most favorable to the State.

The essential fact issue for our determination is whether the evidence shows deliberation. And the fact that there were no eyewitnesses to the actual shootings will not preclude a finding of

that element. It is "well established that the deliberation and premeditation necessary to constitute murder in the first degree may be inferred from the circumstances of the homicide." State v. Goodwin, Mo.Sup., 352 S.W.2d 614, 619.

We have concluded that all the essential elements of first degree murder were shown as to both homicides. It is quite clear that such existed in regard to the killing of William. The only reasonable inference that can be drawn from the evidence is that he was killed by defendant either to facilitate his escape after the shooting of Richard, or to eliminate a possible identifying witness. At any rate, the only reasonable inference is that the shooting of William was deliberate.

Although the situation in regard to the killing of Richard is not quite so clear we have the view, as stated, that deliberation was shown. In that connection it must be kept in mind that defendant and his accomplices, while armed, broke into the trailer through a locked door. We think the only reasonable inference to be drawn from their conduct is that they either intended to commit burglary or intended to assault or kill one or both of the occupants. In either event they were engaged in an unlawful enterprise and could not contend that Richard's resistance to their efforts constituted provocation for the shooting. We said in Goodwin, supra, that "First, and of prime significance, is the proof that at a very early morning hour (five o'clock) defendant forcibly broke into and entered deceased's dwelling armed at the time with the revolver with which the homicide was admittedly committed * * *. The forcible entry bespeaks preparation, going to deliberation. Indeed, the unlawful breaking in aspect of the case approximates or is comparable to that deliberation evinced by lying in wait, then assaulting and killing the victim. Under this view, which is warranted by the record, the act was not impulsive or sudden, but one of a deliberate and premeditated nature, and hence the evidence supports the verdict and judgment." 352 S.W.2d 1. c. 620.

In State v. Holland, 354 Mo. 527, 189 S. W.2d 989, 998, this court stated: "We call special attention to the following cases: State v. Dickson, 78 Mo. 438; State v. Kenyon, 343 Mo. 1168, 126 S.W.2d 245; State v. Taylor, 347 Mo. 607, 148 S.W.2d 802; State v. Rasco, supra [239 Mo. 535, 144 S.W. 449]; State v. Rumfelt, 228 Mo. 443, 128 S.W. 737. In each of these cases the evidence was entirely circumstantial and convictions of first degree murder were sustained. In none of the cases was a second degree murder instruction given. In each case the court considered the question and decided that the circumstances disclosed first degree murder only and an instruction on second degree murder was properly refused. * * * It is important to note that in this, as in many such cases, for example, State v. Rumfelt, supra, the defendant claimed he did not commit the homicide, and of course, therefore, did not offer any evidence of justification or evidence to show a lesser degree of homicide." Moreover, in the case at bar a struggle occurred between unarmed Richard and three armed intruders which continued for several minutes before one of the intruders shot Richard. That factual situation in itself would support a finding of deliberation. And we see nothing in the evidence to indicate that this shooting was a sudden or impulsive act, lacking in deliberation, and hence there was no evidentiary basis for the giving of a second degree murder instruction.

As indicated, we rule that the evidence supported first degree murder submissions and that the court properly refused to give the instructions submitting second degree murder. In connection with our ruling that a second degree instruction was not required we think it should be mentioned that it was defendant's theory of defense, as shown by the argument of his attorney, that, "We are only contesting that he [de-

fendant] was not the person who was out at that trailer. He was not involved."

■ Defendant also contends that the court erred in refusing to give converse instructions offered by him. He offered No. 25, which reads as follows:

"If you do not find and believe from the evidence beyond a reasonable doubt that the defendant, either alone or acting in concert with others, is one of the persons who shot and killed James Richard Lindsay, then you cannot convict the defendant and it is your duty to acquit Charles Cuckovich of that offense."

He also offered No. 26 which was the same except for the name of the victim. Defendant cites State v. Murphy, Mo.Sup., 415 S.W.2d 758, which states, at p. 759, that " '[T]he rule now seems established that a defendant is ordinarily entitled to have given a correct instruction submitting the converse of the state's main instruction; but, if the given instructions fully and fairly cover the same subject matter contained in defendant's converse instruction, it is not prejudicial error to refuse the instruction offered.' "

We rule that the court did not err in refusing the aforementioned instructions. This because the instructions given fully and fairly covered the same subject matter. In the first place, the main instruction (as to each victim) contained the following paragraph near the end thereof: "However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of the foregoing, you must find the defendant not guilty of that offense." Moreover, the court's Instruction 4 (and No. 6 which was identical except as to the name of the victim) was as follows:

"If you do not find and believe from the evidence beyond a reasonable doubt that the defendant either alone or knowingly acting in concert with others con-

sidered taking the life of James Richard Lindsay and reflected upon this matter cooly and fully before shooting him, then you cannot convict the defendant of murder in the first degree and it is your duty to acquit Charles Cuckovich of that offense."

As indicated, we rule this point against defendant.

Ray Bowman, fingerprint expert for the Kansas City Police Department, testified that he attempted to recover latent fingerprints from the Lindsay trailer and from the Hansen home and car; that he was unable to obtain any prints of value from the trailer but did obtain a few cards from the Hansen home and car; that many prints are smudged or for other reasons are not usable; that none of the prints obtained matched the defendant's prints. In his argument defendant's counsel contended that the jury should find defendant not guilty because his fingerprints had not been found at the places mentioned. In an attempt to answer that argument the assistant prosecuting attorney was permitted to state, over objection, that "there aren't one percent of the cases tried in this county who are able to bring in fingerprint identification of anybody." Defendant contends that the court erred in overruling his objection because there was no evidence to support the statement.

■ The statement in question was supported to some extent and in a very general way by the testimony as to the difficulty in obtaining usable prints, but defendant is correct in his assertion that the precise fact stated is not supported by evidence. It is also true that an attorney should not argue matters not in evidence. State v. White, Mo.Sup., 440 S.W.2d 457. We do not, however, consider that the ruling under consideration constituted reversible error. It is our view that the jury would understand that the attorney was just making a guess or estimate concerning the number of cases where fingerprint evi-

28

dence was produced and would regard it more in the nature of argument than a factual statement. We accordingly rule that no reversible error occurred in that regard.

Defendant has briefed a number of points which relate to the manner of qualifying the jury in regard to the death penalty, and also the contention that said penalty is unconstitutional because cruel and unusual. Since this case was submitted, the Supreme Court of the United States, on June 29, 1972, ruled that the death penalty under statutes such as we have in Missouri is violative of the Eighth and Fourteenth Amendments to the United States Constitution, and that the death sentence may not now be imposed. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L. Ed.2d 346; Jackson v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346; Branch v. Texas, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346; Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706; Duisen v. Missouri, 408 U.S. 935, 92 S.Ct. 2855, 33 L.Ed.2d 749; Terry v. Missouri, 408 U.S. 940, 92 S.Ct. 2876, 33 L.Ed.2d 763. We consider it unnecessary to rule these points because, in any event, the death penalty in this case cannot stand. As indicated, we rule that there was no reversible error in the trial of the issues relating to defendant's guilt.

The sole and only punishment for first degree murder in this state is now life imprisonment. § 559.030. The punishment assessed, being unauthorized, is hereby reduced to imprisonment for life. § 547.280 and S.Ct. Rule 28.15.

It is further ordered that the Clerk of this Court forthwith furnish the Warden of the State Penitentiary and the State Department of Corrections with certified copies of this order and judgment.

As so modified, the judgment is affirmed.

All concur.