**STATE of Missouri, Respondent,**

v.

**Joyce CONNOR, Appellant.**

**No. KCD 29938.**

Missouri Court of Appeals,
Western District.

July 31, 1979.

James L. McMullin, McMullin, Wilson & Schwarz, Kansas City, for appellant.

John D. Ashcroft, Atty. Gen., John M. Morris, III, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., SWOFFORD, C. J., and WASSERSTROM, J.

SWOFFORD, Chief Judge.

The defendant was convicted, after jury trial, with violation of Section 563.010 RSMo 1969,[1] the so-called pandering statute, a felony, and her punishment was assessed at a fine of $1,000.00. This appeal from the resultant judgment followed.

The appellant raises two points upon which she asks that this cause be reversed and remanded.

In her Point I, she asserts that the trial court erred in permitting the prosecution to introduce the testimony of Police Officer Michael McKee, over objections of defendant, that several weeks prior to the date upon which this charge is based the defendant solicited him for the purpose of prostitution, this being evidence of another crime.

In Point II, she asserts error in refusing to declare a mistrial after Police Officer Rebecca Rishel testified that the defendant was arrested under two warrants, one based upon this charge of pandering, and the other for possession of narcotics, thus erroneously permitting evidence of another crime, to her prejudice. While neither of these points directly attack the sufficiency of the evidence, a detailed review of the record is necessary for their proper resolution.

The statute under which this prosecution was instituted, Section 563.010 RSMo 1969, part of the chapter applicable to Offenses Against Morals, since repealed by the present Criminal Code, effective January 1, 1979, provided, in pari materia, pertinent to this case:

1.  Prior to the effective date of the new Criminal Code.

"Prostitution—traffic for house of—prohibition—pandering—penalty

That any person * * * who shall induce, persuade, *encourage*, inveigle or entice a female person to become a prostitute * * * shall be guilty of pandering * * * " (Emphasis supplied)

The information herein follows the above terminology of the statute. The state's verdict directing instruction required the finding that "on or about April 18, 1977, in the County of Jackson, State of Missouri, the defendant encouraged a female person: to-wit, Rebecca Rishel, also known as Barbara Hughes, to become a prostitute". (Emphasis supplied).

The evidence and record in this case, viewed in the light most supportive of the judgment, may be thus summarized:

In 1977, the defendant held an occupation license from the City of Kansas City, Missouri as the owner and operator of a dating service under the name of "Dateline" at 4620 Summit, Suite 23, Kansas City, Missouri. This business advertised in the Kansas City newspaper in the want ads. A copy of the ad for April 20, 1977 is an exhibit in the case and reads:

"ALONE–BORED? For an exciting date with an attractive girl, call Dateline, 531–7724"

Another exhibit in evidence is an ad which appeared in Key Magazine, April, 1977, at the top of which is a head and shoulder photo of an exotic young woman, below which appears:

"531–7724
For an
Exciting Date
with an
Attractive Girl
DATELINE"

In the early spring of 1977, the Vice Unit of the Kansas City, Missouri Police Department began an investigation of the dating services operating in the city. This investigation was apparently engendered, at least in part, by complaints from operators of major hotels. The dating services under investigation included "Dateline".

On March 24, 1977, Michael McKee, an officer assigned to the Vice Unit, accompanied by another officer, Jeff Liss, went to the Alameda Plaza Hotel at 11:15 p. m. after being contacted by the hotel management. They were assigned a room, and after consulting the newspaper obtained the telephone number of Dateline and placed a call there. This call was answered by a recorded tape. He left a name of Lawrence Williams and the room number. In about 30 minutes, he received a response on the telephone from a female. This person advised him that "the dating service would cost $60.00" and "an additional $20.00 tip". As a result of this telephone exchange, the defendant came to the room. McKee testified that he recognized defendant's voice as the person with whom he had the telephone conversation a short time before. He had not told her on the telephone that there were two men (Officer Liss) in the room and she remarked upon this fact. During the conversation the defendant stated that they could have sex for $60.00 each or she would give them a "blow job" for $75.00 each. She was placed under arrest and taken to police headquarters and charged with city ordinance violations.

Rebecca Rishel, an undercover officer of the Vice Unit, is the person who the State claims was encouraged to become a prostitute by the defendant, in violation of the statute upon which this charge is based. Her first direct contact with "Dateline" and defendant was on April 18, 1977. On that date, she went to the home of one Debbie Medina in Kansas City. Medina, who had formerly been employed by "Dateline" called the defendant on behalf of Rishel and recalled to defendant that one Sharon, another former employee, had spoken previously to defendant about Rishel. The defendant agreed to talk to Rishel, who then got on the telephone. She told defendant that her name was Barbara Hughes and that she had recently "busted" up with her husband, was in a financial bind, needed money, and that Sharon had said the defendant might be able to help her. In response the defendant told Rishel that she ran a dating service; that she advertised in

the newspaper and in the Key Magazine which was in the motels and that the charge for the service was $60.00, of which the "company" gets half and the girl half. When Rishel asked if the arrangement involved just escort, the defendant responded that "it all depends on what you want to do"; that if something of a more personal nature was involved like sex, there should be at least a $20.00 tip in addition to the regular fee, which "tip" the girl retained. The defendant advised Rishel that she could bet on the fact that most of the "guys" that called were looking for sex; that when the guys called, most of the time she told them the fee was $60.00 and if they wanted something of a more personal nature, it would cost them an additional $20.00 tip; that it is mostly "squared away" as to "what they expect" before the girl goes over there; and, that "you want to be very careful, make 'em show I.D.s or, you know, if you think that they might be a cop." A discussion followed as to the different kinds of sex that might be involved, in words of the vernacular which need not be repeated here, and Rishel was advised in that event "just say straight $80.00" which includes "whatever they want, generally, you know" —"I don't want to haggle about prices with them"; if it is a "straight date", "which you won't run into very often" Rishel was to charge $60.00. The defendant also told Rishel that she would have to sign a contract that she was responsible for her own income and Social Security taxes as an independent contractor before she went to work, and she advised Rishel that the money due defendant could be brought to her home by Rishel.

This conversation was recorded and a transcript consisting of over three single-spaced typewritten pages was offered and received in evidence.

On the following day, April 19, 1977, Officer Rishel went to defendant's apartment at 4620 Summit and signed a form accepting the status of independent contractor and relieving the defendant from any tax liability. This form was in a red loose-leaf notebook containing other such forms executed by others and was taken under war-

rant at the time of defendant's arrest and introduced as evidence at the trial, but is not on file in this Court in accordance with the Rules. However, there is no dispute about the contents of such document and it was read in its entirety into the record and to the jury. In substance, it was an agreement that during her connection with Dateline, Hughes would "be an independent contractor"; that she would be solely responsible for reporting and paying any taxes on income received by her as an escort; that Dateline's only obligation was to arrange introductions between those seeking dates and the independent contractor, who was given the right to decline any date proposed by Dateline; and, relieving Dateline from any responsibility for the conduct of "the other (sic either) party" once a date was accepted by the independent contractor. While the body of the form described the independent contractor as "Barbara C. Hughes", Officer Rishel inadvertently signed her real name, Rebecca K. Rishel, to the document.

Following the signing, the defendant handed Rishel a slip of paper on which was written "Buzz Vincent, 474–4400–1118" which was to be Rishel's first date. The defendant wrote these notations and told Rishel that Vincent was at the Crown Center Hotel. Rishel went to the Crown Center, knocked on the door of Room 1118 and found it to be occupied by a male, whom she described. She had a conversation with him for 15–20 minutes. She then told him she had left her car parked on the street and that she had to go move it and park it legally. She then left the room and did not return. This man was not a police officer.

On this same day, April 19, 1977, an Investigator Stark connected with the Vice Unit went to the Travel Lodge in Kansas City, obtained a room, called Dateline, posed as one Ralph Turner, and made arrangements with the defendant for an "exciting" date with an attractive girl to "go to bed" with him for $60.00 plus a $20.00 tip. He was told by the defendant that if "you don't like the girl that I've chosen to send up there, you let me know, I'll get you

another girl or you can keep your money". He confirmed the fact that the $20.00 extra "will get me laid" with no time limit. Ten minutes later, the defendant called back and told Stark that she thought she might come down herself, gave him her description, and in response to his query "I'll definitely get laid" she indicated her understanding that he just wanted "to get laid in a hurry" and "I'll see you in a little bit". He then left the hotel and did not keep the "date". The tape of this conversation and the transcription thereof is part of the record.

On April 20, 1977, Rishel called the defendant and told her that she had been told to leave the hotel premises by the hotel security people when she tried to keep her date with Buzz Vincent the evening before, the details of this encounter and how this had affected her, but that she was hopeful that if the defendant got "something lined up" she, Rishel, would be kept in mind. On that same date, Sgt. James D. Johnson of the Vice Unit checked into the Continental Hotel, called Dateline, talked to the defendant, was quoted terms and prices upon the basis that he would expect the girl "to go to bed with me" and was told by defendant that this presented "no problem". Then the officer called the defendant and told her his plans had been altered and that he had only until 5:00 o'clock that afternoon (a matter of a short time). The defendant said she had experienced trouble in getting another girl, that she wanted to make one more call or she would come down herself. She called "Steve" in a few minutes and told him she would be down in 15–20 minutes, but when learning her age, he asked for a younger girl. She said she would call this other "gal" for him and that her name was Barbara. The defendant then called Rishel and told her "I got something for you" and gave her the name of Steve Dunlap, Continental Hotel, Room 2114, and told Rishel "he wants to be screwed". The "arrangement" was made. These conversations of Defendant-Sgt. Johnson-Officer Rishel were all taped, transcribed and placed in evidence.

A similar arrangement was made by Officer O'Donnell of the Vice Unit, under the name of Jerry Nelson from Room 735, Muehlebach Hotel, on April 20, 1977, in conversations with the defendant at Dateline wherein he made it plain that he was interested in a girl who was "open minded about sex" and "willing to go to bed". Prices were quoted by defendant and she stated "I'll have a girl in touch with you". She called back and said "I will come down myself" and the arrangements were complete. The conversations were recorded, transcribed and placed in evidence.

On April 21, 1977, Rishel and other officers of the Vice Unit went to the defendant's apartment and placed her under arrest. The following appears in the direct examination of Officer Rishel:

"Q. (Mr. Turner, Prosecutor) What were the circumstances under which you recovered it (the loose-leaf notebook containing the employment contracts) on 4–21–77?

A. We had responded to her apartment—

Q. Who is 'we'?

A. Myself, Investigator Hicks, and Sergeant J. D. Johnson.

Q. All right. And where was it that you went?

A. We responded back to her apartment to place her under arrest on a State warrant for possession of narcotics."

Thereupon, the defense counsel moved for a mistrial since the response elicited evidence of a crime other than the charge for which the defendant was being tried, to the hopeless prejudice of the defendant.

There followed a lengthy argument and colloquy between Court and counsel, during which the witness Rishel was interrogated out of the hearing and presence of the jury. During the course of these proceedings it was developed that when Rishel and the other vice officers were going to defendant's home to arrest her on the charge of pandering, the Narcotics Unit asked them to also serve defendant with a warrant for possession of narcotics since they (Vice Unit) would have the defendant in custody.

It was further developed and agreed that the narcotic charge was based upon certain containers of drugs found in the defendant's possession when she was arrested on March 24, 1977, at the Alameda Plaza Hotel. These were found to be prescription medicines of no criminal significance, and the State dismissed that charge.

The trial court, out of the presence of the jury, stated that upon request of defense counsel the jury would be admonished to disregard the statement of the witness with reference to the narcotic warrant and would be specifically advised that this charge was dismissed by the State; that the drugs were prescribed to the defendant by a licensed physician; and, any other matters or facts that would be reasonable that defense counsel requested. Defense counsel, however, repeatedly and positively stated that they were not requesting that type of action but were standing solely upon the request for a mistrial. Thereupon, the Court overruled the motion for a mistrial.

The defendant did not testify and the only evidence offered in her defense was the testimony of the Commissioner of Revenue of Kansas City, who identified the defendant's application for an Occupational License and the license issued pursuant thereto, under the name "Dateline" for the year 1977. He stated that no detailed investigation was made of the applicants or of the nature of the business conducted, other than a broad category which controlled the fee to be charged for the license.

■■ The resolution of this appeal requires the recognition of the basic purposes of statutes, such as Section 563.010 RSMo 1969 [2] and the application of those principles to the facts of the case before this Court. This statutory proscription against pandering has its genesis in public policy and public welfare in that it is intended to protect persons from compulsory prostitution and to protect the public generally from commercialized vice and its attendant social evils. Its target is procurers and panderers commonly known as "pimps"— those who profit from prostitution and commercialized vice to the detriment of the public generally. It is not aimed at individual or isolated acts of prostitution. 73 C.J.S. Prostitution § 7a, c, pp. 232–234; *State v. McGehee*, 308 Mo. 560, 274 S.W. 70, 71–72 [1] (1925); *City of St. Louis v. Wyatt*, 189 S.W.2d 129, 131 [6] (Mo.App.1945); *City of St. Louis v. Green*, 190 S.W.2d 634, 635–636 [2, 3] (Mo.App.1945).

■ Commercialized vice, by its very designation, comprehends some sort of organization, a continuing and ongoing business for financial gain operating under commercial standards of sales. Section 563.010 is significantly operative in this context for the reason that those engaged in the venture must "stock their shelves", even as the corner grocer.

■ Directing attention specifically to defendant's Point I, it is, of course, true that proof of the commission of separate and distinct crimes is not admissible in a criminal prosecution. There are, however, certain well-defined and salutary exceptions to this rule. These have been often stated to be that evidence of other crimes is competent where it tends to establish " * * * (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial". *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 307 [1] (banc 1954); *State v. Hamell*, 561 S.W.2d 357, 359 [4] (Mo.App.1977), and cases cited therein.

While the briefs herein and independent research have failed to disclose a Missouri decision involving the above-noted exceptions to the exclusionary rule as to the admissibility of separate crimes to this or

---

2. As heretofore noted, this statute was part of the chapter covering "Offenses Against Morals". While repealed by the present Criminal Code, effective January 1, 1979, such Code covers the same class of crimes and the principles here discussed are presently valid and applicable thereunder.

closely analogous factual situations, two decisions are worthy of note.

In *State v. Armstead*, 283 S.W.2d 577 (Mo.1955) the defendant was convicted of knowingly receiving money, without any consideration, from the earnings of a woman engaged in prostitution under a statute included in Chapter 563, Offenses Against Morals, the same source from whence the statute here stems. The defendant was a bellboy in a hotel and was charged with procuring the prostitute upon a certain midnight to service a hotel guest and taking part of the fee. In holding that the evidence was sufficient to support the jury's finding of guilt, the court commented without criticism that the trial court had admitted evidence of two other incidents earlier that night where the same procedures were followed "acting on the theory that the evidence tended to show a common plan". l. c. 579 [1].

In *State v. Smith*, 431 S.W.2d 74 (Mo. 1968), the defendant was found guilty of transporting a female "through" the state (from City of St. Louis to St. Louis County) for the purpose of prostitution, in violation of another section of Offenses Against Morals. The defendant was a taxi driver and the charge was as to a specific act of transportation. The state offered evidence of other acts of transportation by the defendant of the prosecuting witness over a six-day period. The court held such evidence to be admissible under the exceptions above noted as tending to show "a common scheme or plan embracing the commission of separate similar offenses". l. c. 80 [13].

For a well-reasoned case presenting an almost identical factual situation (but not the evidentiary problem as in the case at bar) see *Edwards v. Commonwealth of Virginia*, 218 Va. 994, 243 S.E.2d 834 (1978).

■ Only one logical conclusion may be reached from a review of this record. Dateline was a business venture carried on by the defendant for financial gain, the principal purpose of which was to aid and abet persons desiring the services of a prostitute and to procure and assist persons willing to provide such services. Under this theory at least three of the above-noted exceptions to the exclusionary rule of evidence as to separate crimes, namely, to show motive, intent and a common scheme or plan embracing two or more crimes so related to each other that proof of one established the other. *State v. Reese*, supra; *State v. Hamell*, supra. The evidence as to the March 24, 1977 incident at the Alameda Plaza Hotel (and all other incidents shown by the evidence) was admissible.

While the sufficiency of the evidence to support the conviction of encouraging Rishel to become a prostitute working through Dateline is not challenged, it is worthy to note that recruitment of persons to "date" through Dateline was necessarily an integral part of the *modus operandi* of the business. There is no merit to defendant's Point I and it is ruled against her.

Point II, the remaining assignment of error, raised basically the same arguments as Point I, and defendant relies upon the same authorities. It deals with the statement of Officer Richel regarding the arrest of defendant on April 21, 1977 where she made an answer obviously unresponsive to any question regarding the service of a warrant on the defendant "for possession of narcotics" incident to defendant's arrest by Rishel and others on the Vice Unit, as set forth above. The defendant made timely objection and preserves and presents the point here as being prejudicial evidence of another crime and not within any of the exceptions to the rule excluding such evidence, as hereinabove discussed with reference to Point I. It may be conceded that the statement of Rishel as to a narcotics charge does not, standing alone, fall within those exceptions, but nevertheless defendant is not entitled to relief on this Point for numerous reasons.

In the first place, it was conceded by Court and counsel when the subject was explored outside the presence and hearing of the jury that the statement of Officer Rishel complained of was not responsive to any question, was inadvertent and was not made for any ulterior or bad motive. Fur-

ther, the Court offered to strike the answer, advise the jury to disregard it, explain in detail the fact that the narcotics charge had been dismissed because the drugs involved were found to be legitimate prescriptions by defendant's doctor, a duly licensed physician, or "any other matters or facts that would be reasonable that you (defense counsel) would want to add to it." Also, the trial court stated:

" * * * I sincerely and firmly believed that such an instruction would eliminate any prejudice and that it would not be a question of speculating that they (the jury) would eliminate it. I would feel confident that with an instruction as I have outlined to you, to the jury, that they would in fact not consider the very brief and unexpected answer given by the officer, and that in my opinion, it would then be fair to the defendant, or I wouldn't be doing it."

In response to this offer by the Court, defense counsel stated, " * * * we would just renew our motion for a mistrial". For over 20 pages of this record appear repeated statements by defense counsel, such as: "We can't agree to that"; "Judge, we will have to stand on the motion for a mistrial. We can't agree to anything"; "the only remedy is a mistrial"; "we do not waive our request for a mistrial"; (the proposed admonition and explanation to the jury) "will not be with our consent"; "the defendant * * * wants a mistrial in this case"; and "we are asking purely and simply for a mistrial in this case, sir, and for *nothing else*". (Emphasis in last quotation supplied).

Of course, it is a principle of Missouri law so firmly established that citation of authorities seems unnecessary that the declaration of a mistrial is an extreme and drastic remedy and should only be resorted to when prejudice can be removed in no other way. The granting or refusal of a mistrial usually rests "necessarily and properly" within the sound discretion of a trial court who is in a better position to judge any prejudicial effect of the evidence or trial incident complained of and the possi-

bility of the removal of any prejudice that may have been engendered by action short of mistrial. *State v. Camper*, 391 S.W.2d 926, 928 [2, 3] (Mo.1965); *State v. Minor*, 556 S.W.2d 35, 39 [5] (Mo. banc 1977).

It is only where the trial court has obviously abused its discretion that this Court will interfere with the exercise thereof. This restraint is particularly applicable where the *only* relief sought by the defendant is a mistrial and insists that *only* this action be taken. *State v. Cuckovich*, 485 S.W.2d 16, 24 [13] (Mo. banc 1972).

In *Cuckovich*, it was said at l. c. 24: "We think it is significant that the only relief defendant sought was a mistrial. It is our view that he should have asked also that the statement be stricken and the jury ordered to disregard it. In that way the court could have considered corrective action short of mistrial * * *"

In the opinion this Court in *State v. Tygart*, 531 S.W.2d 47 (Mo.App.1975) followed the principle above quoted from *Cuckovich* and said, at l. c. 49 [1]:

" * * * In the instant case the trial court obviously concluded that it was inappropriate to declare a mistrial because expurgatory relief existed * * *. In view of the nature of the matter complained of and defense counsel's declination to countenance any curative relief short of a mistrial, this court is unwilling to hold that the trial court abused its discretion in refusing to declare a mistrial * * *.

In the case now under consideration the trial court suggested curative and expurgatory relief far beyond either the importance of the testimonial incident claimed to have resulted in prejudice and greatly exceeded the defendant's rights to relief from the claimed prejudice of Officer Rishel's voluntary and inadvertent reference to a narcotics warrant. In doing so, it afforded the defendant relief which could have inured to her ultimate benefit and showed an exercise of fine and liberal judicial discretion. This Court cannot and will not find any abuse of discretion under the cir-

cumstances. Point II is ruled against appellant.

The judgment is affirmed.

All concur.