**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Gary Thurman TATUM,
Defendant-Appellant.**

**No. 11810.**

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 10, 1981.

Motion for Rehearing and to Transfer Denied Aug. 25, 1981.

Bruce K. Kirby, Jones, Keeter, Karchmer, Nelms & Sullivan, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

MAUS, Chief Judge.

The defendant was charged with having committed murder in the second degree by stabbing Howard Scott to death on October 4, 1979. He was found guilty of that offense by a jury and sentenced to imprisonment for 20 years in accordance with the verdict. He presents three points on appeal which require a summary of the evidence.

The victim was a 37 year old man who had a drinking problem. At the time of his death he lived in a "lower income residence" hotel in the downtown Springfield area. On October 4, 1979, at 1:00 a. m. two police officers in a patrol car a few blocks northwest of the hotel saw the victim walking in the direction of the hotel. The victim visited briefly with the officers and then continued on his way. Scott was described as mildly intoxicated.

Within a few minutes the officers were called to go to the hotel. When they arrived at 1:11 a. m. they saw Scott standing, with the assistance of the hotel night manager, in front of the hotel. Scott was weak and his clothing was bloody. He was taken to a hospital where he died from the loss of blood from 5 stab wounds in the back. The instrument that made two of the wounds struck bone and was diverted from further penetration. However, the other three wounds entered the body generally perpendicularly and penetrated to a depth of approximately four inches. Scott also had superficial cuts to his face and neck. The pathologist who performed the autopsy concluded the wounds were not compatible with accident or self-infliction.

The police checked the area for suspects. Two couples were observed. While searching the area, two officers parked their car in an alley approximately one and one-half blocks southeast from the hotel. The lights of the patrol car were shining east. While the car was so parked at about 1:25 a. m., a white male approximately 5' 9" or 10" with brown hair extending below his ears walked

into the lights. The individual started to run. The officers gave chase but lost the sighted individual in the 400 block of E. Elm. The officers could identify the person only by general description. During the night another officer at an unidentified time and place stopped one Randy Sinclair. From the rear, the defendant and Sinclair had the same general appearance. At the time the defendant lived southeast of the hotel at 440 E. Elm. Sinclair lived on south Campbell, several blocks southwest of the hotel.

The testimony of one Linda Quick pertained to the activities of the defendant and Randy Sinclair on the night in question. She stated she spent the evening of October 3, 1979, in the Town and Country Bar which adjoined the lobby of the hotel in question on the west. She was with Ann Willoughby, Theresa Frey and Randy Sinclair. The defendant was talking with the group when Quick, Willoughby and Sinclair left. They walked to the Galaxie Bar, which she described as a "gay bar", not far from the Town and Country Bar. They returned to the Town and County Bar about 1:00 a. m. After talking to the police she said, "[w]e went home". She was living with Willoughby, Sinclair and one Danny Hahn. Then on cross-examination she made several conflicting and confusing answers. A police officer came to her home the night in question. Defense counsel asked her the following question: "All right. That the police arrived at the scene, and she said— you said you had not seen him (Sinclair) again up until the police arrived. At that time, you saw him running so the police wouldn't see him. Do you recall that?" She answered "Yeah". She was then asked, "Was that a true statement?" She answered, "No. He didn't come back to the house". At first she denied Sinclair was there when the officer was there, but later admitted he was in the apartment. On redirect, she said she saw Sinclair run, but she didn't know the whereabouts.

On October 15, 1979, for an undisclosed reason the defendant was in the Municipal Court. There, apparently acting upon the defendant's admissions to an informant who did not testify, two police officers arrested the defendant for the murder in question. The three walked the short distance to the police station. At the police station the defendant gave the officers a recorded statement. After this statement was completed, a stenographer was called and an additional statement was taken. When the latter statement was transcribed, the defendant initialed each page and signed his name at the end.

The following is a summary of the defendant's declarations in those statements. He had known Scott about one month. During that time he loaned Scott $7. Shortly before the stabbing, he left the Town and Country Bar, intending to walk about one block east to the Antler Bar. As he passed an alley he saw Scott walking south in the alley toward the hotel. He approached Scott and asked for the money "and he said no and he asked for some more and that's when we got into it." During the fight his hunting-type knife fell from its scabbard and "we wrestled for the knife and I picked it up and stabbed him in the back." He was also asked, "You pulled the knife on him when you first saw him and said I want my money?" The defendant answered, "I didn't pull it out first. I asked about it first and *that's when I pulled it out.*" (emphasis added). The defendant did go to the Antler Bar, but shortly returned to the Town and Country Bar and when he left he said he threw the knife in the alley behind the bar.

The next day the police made a thorough search of that alley but were unable to find the knife. On October 17, 1979, the two arresting officers again took a recorded statement from the defendant with the questions centered upon the location of the knife. In that statement he said he put the knife in the alley behind the house at 440 E. Elm. He accompanied the officers to that location and the knife was found.

The defendant did testify at the trial. He stated Scott started the fight and the knife fell out and he got it and he guessed he was jamming it into Scott. At another

time he said Scott fell on the knife. He concluded that he was defending himself. However, he admitted he told his girl friend he killed Scott because Scott owed him some money.

■ The defendant's first point is that the trial court erred in admitting the second recorded statement. The basis for this point is that the defendant was not again given the *Miranda* warning just before that statement was taken. The evidence on that point follows. When the defendant was arrested he was orally advised of his rights. In the interrogation room in the police station, the officers used the customary waiver of rights form containing the full *Miranda* warning. One of the officers read each declaration to the defendant and asked if he understood the right declared, to which the defendant replied he did. The waiver portion of the form was then read to him and the defendant then signed the waiver. This was on October 15, 1979.

Then on October 17, 1979, the officers wanted to talk to the defendant concerning the location of the knife. Before taking the second recorded statement, the interrogating officer said: "Gary, do you recall the other day when we talked to you we advised you of your rights to remain silent and that you didn't have to talk to us and anything you said could be used against you in court. You could have a lawyer present with you during questioning, do you remember that? Do you still understand your rights?" To this the defendant replied, "Yes". The defendant points out the officer's recitation of rights omitted advising the defendant he had a right to end the questioning at any time and that if he was indigent an attorney would be appointed for him. He cites *United States v. Turner*, 565 F.2d 539 (8th Cir. 1977) as holding the first omission fatally defective and *State v. Williams*, 486 S.W.2d 468 (Mo.1972) as holding the latter omission fatally defective.

However, the defendant does not question the fact he was twice fully advised on his rights on October 15, 1979, before he gave the second recorded statement on October 17, 1979. "Miranda does not require multiple warnings." *Moore v. Hopper*, 389 F.Supp. 931, 933 (D.C.Ga.1974). "The mere lapse of time between the receipt of the Miranda warnings and the giving of the incriminating statement does not require exclusion of the evidence." *State v. Brown*, 601 S.W.2d 311, 313 (Mo.App.1980). "The question to be answered is: Did defendant at the time of responding to the officer's inquiry in fact knowingly, voluntarily and intelligently waive the rights delineated in Miranda?" *State v. Brown*, supra, 601 S.W.2d at 313. These principles have been applied where no redeclaration of rights was given before the statement was taken, *State v. Brown*, supra; and where the redeclaration of rights was incomplete. *State v. Olds*, 603 S.W.2d 501 (Mo. banc 1980); *United States v. Daulton*, 488 F.2d 524 (5th Cir. 1973). The lapse of the following periods between a full Miranda warning and an incriminating statement have been held not to cause the statement to be inadmissible under the above test: within 21 hours, *State v. Olds*, supra; two days, *State v. Brown*, supra; three days, *Maquire v. United States*, 396 F.2d 327 (9th Cir. 1968); twelve days, *Biddy v. Diamond*, 516 F.2d 118 (5th Cir. 1975); thirteen days, *United States v. Daulton*, supra.

In support of this point, the defendant emphasizes his testimony that he could not read or write. Yet on cross-examination he admitted he wrote his girl friend one letter. He also emphasizes the testimony of a psychiatrist that he had an I. Q. of 74, borderline retardation; he could not read or write; and he would tend to follow an interrogator. Yet, that psychiatrist in speaking of the Miranda warning said: "He would have been able to understand that, yes". The defendant's testimony concerning being advised of his rights and his understanding of those rights not only conflicted with the testimony of the interrogating officers, but it is self-conflicting and self-defeating. On October 17, 1979, before the second recorded statement was taken, the defendant said he understood his rights. The point is denied.

The defendant's next point is based upon the state's references to the fact police officers saw a man of the defendant's general description running from the scene. The first reference came during the prosecutor's opening statement. The trial court then reserved its ruling on the defendant's objection until the evidence was offered. After the officers had testified they could not identify the fleeing man as the defendant other than by general description, the trial court ordered the testimony stricken and directed the jury to disregard the same. The defendant's contention the trial court erred in not then declaring a mistrial must be denied for two reasons.

■ Assuming these references to be improper, a mistrial was not per se mandatory. Whether or not a mistrial was required was for the sound discretion of the trial court. *State v. Hodges*, 586 S.W.2d 420 (Mo.App.1979). In view of all the evidence, including the three statements of the defendant, there was no question but that the defendant was involved in the stabbing death of Scott. Evidence the defendant was fleeing the scene could provide some inference he realized his involvement was criminal. *State v. Tyler*, 306 S.W.2d 452 (Mo.1957). However, because of the defendant's declarations and testimony about how the stabbing occurred, even if such references were improper, the trial court was not required to find those references were so prejudicial the admonition was not a sufficient remedy. *State v. Minor*, 556 S.W.2d 35 (Mo. banc 1977) (vacated on other grounds).

■ Moreover, from the vantage point of a printed record and time for its careful perusal, it does not appear these references to the fleeing individual were improper. The defendant premised his objections and now premises his argument upon the proposition the evidence established it was Sinclair running from the officers. The record does not compel that conclusion. There was unobjected to hearsay that Officer Sanderson, at an unspecified time and place, stopped Sinclair who had the same general description. As noted in the factual review,

Linda Quick indicated she went home on South Campbell with Sinclair with no suggestion he ran from the area or the officers. After a series of confusing and conflicting statements, she concluded she saw Sinclair run, but she had no idea where. A fair summary of the evidence on the point is that the fleeing individual was of the general description of the defendant; he was pursued by the officers; they lost him in the 400 block of E. Elm; and the defendant lived at 440 E. Elm. Under the circumstances, the state's references to the fleeing man were not improper. *State v. Tash*, 528 S.W.2d 775 (Mo.App.1975).

■ The defendant's last point is that the trial court was required to declare a mistrial because of a police officer's reference to a hearsay declaration of the defendant that he was going to rob someone. The officer did investigate the incident which, of course, included interviewing individuals who frequented or were employed in the area. Upon cross-examination, defense counsel was attempting to establish the officer had no information that would indicate the incident was not just a fight over $7. After dealing with several questions along these lines, the officer was squarely called upon for an answer. He replied: "That doesn't appear to be the case with the investigation and the statements from the girls, stating he was going to rob someone and . . . . " This did not require a mistrial. The answer was clearly invited. *State v. Paige*, 446 S.W.2d 798 (Mo.1969). Second, the court did instruct the jury to disregard the answer. The defendant sought no further relief and under these circumstances, he cannot now seek a reversal because the court did not declare a mistrial. *State v. Cuckovich*, 485 S.W.2d 16 (Mo. banc 1972).

The judgment is affirmed.

PREWITT, P. J., and HOGAN and BILLINGS, JJ., concur.